Argued and submitted May 20, affirmed June 29, 1988

CUSMA,
*Petitioner,*

*v.*

CITY OF OREGON CITY,
*Respondent.*

(LUBA 87-093; CA A47965)

757 P2d 433

Daniel B. Cooper, Portland, argued the cause for petitioner. With him on the brief were John B. Leahy, Colleen M. Morgan and Williams, Fredrickson, Stark & Weisensee, P. C., Portland.

Edward J. Sullivan, Portland, argued the cause for respondent. With him on the brief were Mark J. Greenfield and Mitchell, Lang & Smith, Portland.

Before Warren, Presiding Judge, and Richardson and Deits, Judges.

RICHARDSON, J.

**RICHARDSON, J.**

Petitioner is the executive officer of the Metropolitan Service District (Metro), which operates the Clackamas Transfer and Recycling Center (center), a solid waste transfer facility located in Oregon City. The city issued a conditional use permit to Metro in 1981, allowing it to operate the center and imposing a daily tonnage limitation on the amount of solid waste which could be processed there. The limitation has been reviewed periodically and, in June, 1986, the city fixed it at 700 tons a day. In June, 1987, Metro requested the city to modify the permit to provide for unlimited tonnage. The city denied the request, and petitioner appealed to LUBA, which affirmed the city's decision. Petitioner seeks review of LUBA's order, and we affirm.

Petitioner makes two assignments. She contends, first, that, by statute, Metro's regulatory authority over solid waste and other matters, together with its actions in the exercise of that authority, preempt the city's land use regulations insofar as they apply to solid waste. She relies on ORS 197.190 and on various provisions in ORS chapters 268 and 459. The dispositive statute, ORS 459.095(1), provides, in relevant part:

> "No ordinance, order, regulation or contract affecting solid or liquid waste disposal, resource recovery or solid waste management shall be adopted by a local government unit if such ordinance, order, regulation or contract conflicts * * * with a solid waste management plan or program adopted by a metropolitan service district and approved by the department [of Environmental Quality] or any ordinances or regulations adopted pursuant to such plan or program."

Metro adopted, and DEQ approved, a solid waste management plan in 1974. However, LUBA concluded that the city's regulations were not preempted, because

> "Metro cites nothing in its Solid Waste Management Plan which prohibits the local government from adopting controls on Metro owned or operated facilities. Indeed, part of Metro's plan provides that
>
> > " 'existing zoning of the site and surrounding areas should be industrial, or the land must be rezoned industrial, or a conditional use permit must be obtained.' Metro Solid Waste Management Plan 14-6; 14-7.

"With this provision, Metro appears to recognize the existence of local zoning controls (and, arguably, limits to Metro's broad authority). Metro's plan does not establish tonnage limits or otherwise suggest that some local regulation of Metro's facilities is preempted. LUBA finds the statutes cited by Metro and the Metro Solid Waste Plan do not clearly establish the preemption Metro asserts. The Board concludes the city is free to establish the tonnage limit consistent with its own land use controls."

■ Petitioner appears to agree that Metro's plan contains nothing which conflicts with the city's regulations, but she argues that the preemptive effect of ORS 459.095(1) is not restricted to conflicts between local regulations and the plan itself. That is correct. The statute also makes local regulations inapplicable if they conflict with "ordinances or regulations adopted pursuant to" an approved plan. Petitioner further contends that Metro's

"plan implementation program has consistently found the need to ignore the tonnage limit. Metro implements this Plan through its program of action, ratification and resolutions.

"Metro has established this active program which invalidates Oregon City's ability to set conditions on the use of the [center]. Metro has established this program by: (1) blatantly ignoring those conditions which it determined to be in conflict with the region's solid waste disposal needs; (2) application to the City to rescind the limit; (3) challenging the City's authority to set conditions before the Land Use Board of Appeals; and (4) by adopting resolutions clarifying the [center's] role in the continuously developing plan." (Footnotes omitted.)

■■ Petitioner's first three points do not assist her. Neither "blatant" disregard for local requirements, an application to the local government to change its requirements nor an appeal to LUBA from the local refusal are regulatory acts by Metro of the kind contemplated by ORS 459.095(1). The Metro resolutions mentioned in petitioner's fourth point present a closer question. In 1984, Metro adopted Resolution No. 84-506, designating and establishing criteria for three transfer stations, including the center. In January 1988, after the current and related controversies with the city were in progress, Metro's council adopted Resolution No. 88-820A. It provides, in part:

"BE IT RESOLVED,

"1. That the Council of the Metropolitan Service District finds the 700 tons per day limit is an unreasonable operating condition on a facility that provides a needed public service to persons in the region.

"2. That the Council of the Metropolitan Service District determines that the practice of not establishing a Metropolitan Service District imposed limit on usage of the [center] should continue to be District policy in administering the Solid Waste Management Plan. The imposition of a tonnage limit on the [center] is contrary to the District's Solid Waste Management Plan.

"3. That the Council of the Metropolitan Service District requests General Counsel to seek to maintain District policy of unlimited usage for the [center] through the existing litigation pending on the issue."

Even if we assume that resolutions of that kind constitute "ordinances or regulations" within the meaning of ORS 459.095(1), we conclude that, in substance, the two resolutions do not establish regulations "pursuant to" Metro's plan. The quoted portion of the 1988 resolution refers to the continuation and maintenance of Metro's policy in administering the plan and states that the imposition of a tonnage limit is contrary to the plan. However, there is nothing in the plan to support the assertion in the resolution that a tonnage limit is contrary to the plan, if such a limit is imposed pursuant to local land use regulations. As LUBA's opinion notes, the plan specifically provides that Metro may be required to obtain conditional use permits for the operation of its facilities. The plan also states that the "use as a transfer station should not conflict with existing land uses surrounding the site." To the extent that the resolutions suggest that the plan supercedes local regulation of the kind which the city has applied, they are not consistent with the plan. If petitioner's intended point is that the resolutions effectively amend the plan rather than implement it, nothing in the record indicates that the resolutions, like the original plan, were approved by DEQ.[1] We conclude that Metro has not satisfied the

---

[1] We note, too, that the resolution's recitation that it merely continues Metro's "policy of unlimited usage" is belied by the fact that, from 1981 to 1987, Metro accepted the tonnage limits under the conditional use permit and apparently did not assert that its plan foreclosed their imposition.

conditions that ORS 459.095(1) establishes for the preemption of the city's regulation, and we reject petitioner's first assignment.[2]

■■ Petitioner's second assignment challenges LUBA's conclusions that there was substantial evidence to support the city's findings that the permit modification sought by Metro failed to satisfy the litter and traffic standards of the city code. Petitioner contends that LUBA considered only evidence supporting the findings and did not take into account countervailing evidence in the record which tended to detract from the supporting evidence. Consequently, according to petitioner, LUBA failed to apply the substantial evidence test of ORS 197.835(8)(a)(C) in the manner required by *Younger v. City of Portland,* 305 Or 346, 752 P2d 262 (1988).

The city points out that, although *Younger* had not been decided at the time of LUBA's proceedings in this case, the city's counsel, who also represented the petitioners who later prevailed in *Younger,* graciously apprised LUBA of the "pendency of the *Younger* case before the Supreme Court and contended that, however that case was decided, [the city] should prevail on the substantial evidence test."

It is not completely clear whether petitioner's point is *only* that LUBA did not follow the methodology for substantial evidence *review* delineated in *Younger* or whether she also argues that *we* should reverse because the findings were not supported by substantial evidence. In either event, our review is confined to determining whether LUBA understood and applied the substantial evidence test correctly. In the absence of exceptional circumstances, which are not present here, we may not substitute our view for LUBA's about whether there was substantial evidence to sustain a local finding, as distinct from reviewing LUBA's order to assure that it used the right

---

[2] Petitioner also appears to argue that, contrary to LUBA's conclusion, the city misconstrued its own comprehensive plan as permitting it to regulate the center, because the plan provides that solid waste management is a matter of regional concern. LUBA rejected that argument, for essentially the same reasons that it rejected petitioner's principal argument. We agree with LUBA.

The statutes, other than ORS 459.095(1), on which petitioner relies do not require separate discussion in this opinion. However, the other provisions may be relevant to any future efforts by Metro to give its regulations predominance over the city's.

approach in determining whether there was. *See Younger v. City of Portland, supra,* 305 Or at 358-60.

LUBA did understand and apply the test properly. Its conclusion regarding the litter finding was preceded by a discussion of both parties' evidence. The same is also true of LUBA's conclusion concerning the city's traffic finding. After discussing petitioner's contentions regarding the traffic issue, LUBA noted that they were based largely on speculation rather than evidence. Similarly, LUBA discussed the evidence of both parties in connection with several of the city's other findings which it found were not supported by substantial evidence. LUBA's order affirmatively shows that it correctly understood the scope of its review and conducted its review consistently with the requirements of *Younger.*

Affirmed.