Argued and submitted December 9, 1991, affirmed January 8, 1992

# THE TERRACES CONDOMINIUM ASSOCIATION,
*Respondent,*

*v.*

# CITY OF PORTLAND,
*Respondent below,*

*and*

# Franklin G. DRAKE
## and Preston Hiefield,
*Petitioners.*

(LUBA 91-048; CA A72173)

823 P2d 1004

Stephen T. Janik, Portland, argued the cause for petitioners. With him on the brief were Richard M. Whitman and Ball, Janik & Novack, Portland.

J. David Bennett, Portland, argued the cause for respondent. With him on the brief were Margot Poznanski and Copeland, Landye, Bennett and Wolf, Portland.

Before Richardson, Presiding Judge, and Deits and Durham, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Petitioners seek review of LUBA's reversal of the City of Portland's order interpreting two earlier land use decisions. The interpretation would allow petitioners to build a 150-unit condominium project on a parcel known as tax lot 59. The issue is whether the earlier decisions, made while tax lot 59 and an adjoining lot were part of one parcel that was later divided, gave petitioners the right to develop tax lot 59 at a greater density than applicable zoning regulations would allow for that lot alone, but not for the two lots together. We affirm.

We quote from LUBA's opinion[1] the facts that are necessary to an understanding of the issues that we will address:

"Tax lot 59 consists of 2.04 acres and is zoned Multifamily Residential (R-1). The R-1 zone limits the development density of tax lot 59 to approximately 80 units. Intervenors did not request a variance to the density limitations of the R-1 zone to gain approval to construct the proposed 150 condominium units. Rather, intervenors requested an interpretation from the city that 150 units could be built on tax lot 59 on the basis of prior city zoning approvals and prior property transactions involving tax lot 59 and tax lot 60 (an adjacent parcel). To understand intervenors' request, it is necessary to outline the development history of tax lots 59 and 60.

"Tax lot 59 was formerly a part of a parcel totalling approximately ten acres. This ten acre parcel was previously owned by a single developer.

"In 1973, developer applied for variance approval to enable construction of taller buildings on the entire ten acre site than permitted by the applicable residential zone. The city approved the requested height variance. The 1973 variance authorized building heights of up to seven stories on the ten acre site to enable construction of a 220 unit condominium project. However, developer did not construct these units.

"In 1977, developer requested another variance to increase the height of two buildings planned for the portion of the ten acre site which is now known as tax lot 59.

---

[1] We refer to the parties by their designations in this court. In LUBA's opinion, the parties were referred to by their designations there. Petitioners were "intervenors" before LUBA.

Developer sought to increase the height of such buildings from the seven stories authorized by the 1973 variance, to eleven stories for one building, and fourteen stories for the other. The city approved the second height variance, subject to the following condition:

" 'By accepting this variance, height variances granted [in 1973] are rescinded.'

"In 1978, developer developed the north area of the ten acre site with 56 condominium units, and foundations and garages for 14 additional units (for a total project of 70 units), which developer then sold. A homeowners association was formed for the condominium units developed on the north area of the ten acre site. At this point, developer owned only what is now tax lots 59 and 60.

"While developer retained its interest in what is now known as tax lot 59, it never developed it due to financial difficulties. In 1986, pursuant to the homeowners association master agreement, developer conveyed what is now known as tax lot 60 to the homeowners association[7] [for open space use, subject to a restriction against development]. * * * Subsequently, developer sold its interest in tax lot 59, and any interest it may have retained in tax lot 60, to intervenors.

"When intervenors were ready to develop tax lot 59, they requested an interpretation of the [Portland City Code] from the planning director regarding the development rights of tax lot 59. Specifically, intervenors requested that the city determine tax lot 59 had acquired the development rights which would otherwise belong to tax lot 60, and that tax lot 59 could lawfully be developed with 150 condominium units. * * *

"[After intervening decisions at lower levels, the city council approved the proposal, explaining]:

" 'The City Council concludes that [intervenors] may construct 150 units on Tax Lot 59 * * * subject to [conditions of approval]. This conclusion is based on two grounds, each of which is set forth below.'

"The first ground for the city's decision is '[t]he proposed development is consistent with the previously approved variance and is not affected by the dedication of open space.' The second ground for the challenged decision is '[t]he variance in this case runs with the land.' The reasoning supporting these bases for the city's decision is as follows:

" '[1]   The transfer of an interest in Tax Lot 60 to the unit

owners association was in fulfillment of the plan imposed on the Project Site as part of [the 1977 variance approval]. It is analogous to the effect of commonly owned open spaces in Planned Unit Developments and Subdivisions. Just as in those cases a transfer of open space to the unit owners association does not reduce approved density.'

" 'While [the 1977 variance] did not specifically address density issues, the variance did grant approval of a specific site plan that included structures designed for high density development on Tax Lot 59. Approval of the height variances necessarily incorporated approval for the level of housing density appropriate for the approved structures. The application that was approved in the variance decision required the maintenance of Tax Lot 60 as open space, but did not mandate that any particular party hold title to Tax Lot 60. The proposal now before the Council fits within the parameters of the approved variance since it retains the open space required by the approved plan and retains the level of density that is implicit in the structures that were approved in the height variances.'

" '[2]    * * * [T]he approvals and conditions contained in the [1973 and 1977 variance approvals] run with the Project Site, and [intervenors have] acquired a vested right to complete the project described in the submission made in conjunction with these approvals, and [intervenors] may therefore construct 150 dwelling units on Tax Lot 59 as approved [under the 1977 variance].' (Some footnotes omitted.)

---

"'7 There is no dispute that, until 1986, tax lots 59 and 60 were one parcel and were not separately described. In other words, as of 1986, they had not been divided. The parties agree that developer's conveyance of tax lot 60 in 1986 effected a division of the original parcel, creating tax lots 59 and 60."

Respondent appealed to LUBA, contending, *inter alia*, that the city erroneously construed the 1977 variance as allowing a greater density on tax lot 59 than is permitted in

the zone.[2] LUBA agreed with respondent. It reasoned that the city's interpretation of the 1977 variance posited "a kind of master plan allowing a 150 unit residential density for tax lot 59 and requiring that tax lot 60 be dedicated as open space" with a concomitant "density transfer of tax lot 60's development rights to tax lot 59." LUBA rejected the city's interpretation for several reasons. First, the city could not have approved a master plan or transfer of densities in 1977, because it had no code provisions authorizing such approvals at that time. Second, LUBA concluded that the 1977 variance pertained only to height, not density. LUBA also determined that there was "nothing in the 1977 variance to suggest" that it required the dedication of tax lot 60 as open space or contemplated a transfer of development rights between the two lots that were then part of one parcel.

The 1977 variance recited that the "approval is based generally on the plans submitted" in support of it. Those plans were not in the record before LUBA in any form that identified them as such. However, petitioners argued that certain evidence in the record revealed what the plans were and supported the finding that tax lot 60 was to be designated open space and all of the authorized development was to take place on tax lot 59. LUBA ruled that that evidence, consisting of "an unlabeled document," a tax lot map and certain untranscribed tapes of the city's proceedings, was not of a kind "upon which a reasonable person would rely" in making a finding and, therefore, that there was not substantial evidence in the whole record to support the finding. LUBA's ultimate conclusion was that the variance had no relevance to the city's density limitation and that the proposed level of development would violate that limitation.

■ Petitioners argue in their first assignment that LUBA lacked jurisdiction, because the city's action was an interpretation of the variances, not an application of its land use regulations. Therefore, it was not a "land use decision" as defined in ORS 197.015(10)(a)(A). The argument is incorrect, for at least two reasons. First, whatever be the label that petitioners and the city give it, the decision obviously entailed

---

[2] Respondent also argued that the city's vested rights determination was erroneous. LUBA agreed. Petitioners do not assign error to that conclusion.

the application of the density provisions in the city land use regulations. Petitioners sought, and the city gave, an interpretation that, in effect, made those provisions inapplicable; however, that negative decision was nonetheless an application of the provisions.

The second reason is that the "interpretation" of a variance necessarily involves the application of the land use regulations under and from which the variance was allowed. If interpretation is necessary to ascertain what the variance permitted, the regulatory provisions that governed variances and the uses in question when the variance was granted had to be considered along with the variance itself. A variance can only be understood by reference to the legislatively defined uses that it allows an applicant to vary from or to. Petitioners' contrary understanding would allow expanded noncomplying uses of land to be authorized on the basis of the perceived meaning of the order allowing the original noncomplying use, rather than on the land use regulations that determine what the order *could* have authorized and that the state legislature has required local governments to adopt and apply in authorizing uses of land.[3] We reject petitioners' jurisdictional argument.

■    Petitioners next contend that LUBA erred by concluding that there was insufficient evidentiary support for the city's finding that the 1977 variance approved a site plan and allowed "a specific level of development on tax lot 59." Petitioners' first point is that respondent's assignment to LUBA was that "there is no substantial evidence in the record" to support the finding. However, they explain:

> "Somehow, LUBA converted the allegation that there is *no* evidence in the Record into the claim that there is not substantial evidence in the Record as a whole. It is well settled that in reviewing an allegation that there is no substantial evidence supporting the decision, if there is *any* substantial evidence in the record supporting the decision, the assignment of error must be denied." (Emphasis petitioners'.)

---

[3] We reiterate that there is no issue of vested rights or nonconforming use before us.

Respondent answers:

> "This proposition is far from being well settled; in fact it is ridiculous. In the first place, [respondent's] citation to ORS 197.835(7) makes it clear that it was arguing that the City Council fell afoul of the provision requiring that LUBA reverse or remand if a local government '[m]ade a decision not supported by substantial evidence in the whole record.' ORS 197.835(7)(a)(C). There is no other statutory basis for attack on the evidentiary support of a local government decision, and accordingly, [respondent] could not have meant anything else. In the second place, an argument that there is 'no substantial evidence' is far from an argument that there is no evidence."

Respondent is correct. Moreover, the way that respondent phrased its assignment to LUBA could not have permitted LUBA to apply a test like the one that petitioners propound, which is contrary to the test required by the statute and by *Younger v. City of Portland*, 305 Or 346, 752 P2d 262 (1988).

■■ Petitioners also contend that there was substantial evidence in the whole record to support the finding. Our review of that question is limited to whether LUBA correctly understood and applied the statutory test. *Cusma v. City of Oregon City*, 92 Or App 1, 757 P2d 433 (1988). It did.

■■ Petitioners next argue that LUBA should have remanded the decision rather than reversing it. They rely on OAR 661-10-071, which delineates the situations that call for reversals or remands by LUBA. That rule places decisions that violate applicable law or are prohibited as a matter of law in the first category and decisions that lack evidentiary support in the second. However, petitioners are incorrect in their premise that LUBA's decision depended on a lack of substantial evidence to support any finding. There were independent legal bases for the decision: the 1977 variance could not have had the effect ascribed to it by petitioners and the city, because the city had no authority to give it that effect under the ordinances that existed in 1977, and the earlier variances relate only to height, not density.

In their last assignment, petitioners contend:

"LUBA Erred When it Concluded that the Transfer of Tax Lot 60 Reduced the Density Allocated to Tax Lot 59 Under the 1977 Variance."

The assignment turns the issue backward. Respondent argues, rightly, that LUBA's conclusion was not that "density once allocated to Tax Lot 59 was reduced by the conveyance of Tax Lot 60," but was that the "1977 variance was not legally effective to allocate any particular density to Tax Lot 59."

The other contentions that petitioners make under the same assignment are incorrect and require no discussion.

Affirmed.