Argued and submitted June 4, 2001, affirmed January 23, 2002

CITIZENS AGAINST IRRESPONSIBLE GROWTH,
Steven Larrance, Walter Hellman,
and Rick VanBeveren,
*Petitioners,*

*v.*

METRO
and City of Hillsboro,
*Respondents.*

99-007; A113961

38 P3d 956

Lawrence R. Derr argued the cause for petitioners. With him on the brief was Josselson, Potter & Roberts.

Larry S. Shaw argued the cause and filed the brief for respondent Metro.

Timothy J. Sercombe argued the cause for respondent City of Hillsboro. With him on the brief were William K. Kabeiseman and Preston Gates & Ellis LLP.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Linder, Judge.

DEITS, C. J.

---

* Deits, C. J., *vice* Wollheim, J.

**DEITS, C. J.**

Petitioners[1] seek judicial review of a LUBA final opinion and order affirming a Metropolitan Service District (Metro) amendment of the urban growth boundary (UGB) for the Portland metropolitan area south of the City of Hillsboro. We affirm.

The relevant facts are taken from LUBA's order and the record below. *Citizens Against Irresponsible Growth v. Metro*, 39 Or LUBA 539 (2001). ORS 197.296 (1999) required that Metro "provide a 20-year supply of buildable residential land within the UGB." *Id.* at 541. ORS 197.299 (1999) provided that Metro "must add to the UGB one-half of any additional land needed to satisfy that 20-year supply" requirement. *Id.* Metro studied the existing UGB and "determined that it did not include the required 20-year supply of buildable residential land." *Id.* Metro then looked to lands within one mile of the UGB for possible inclusion in an amended UGB. Those lands were "primarily lands within previously designated urban reserve areas (URAs)."[2] *Id.*

As a result of the above process, Metro then adopted Ordinance 98-788C amending the UGB by adding "approximately 354 acres of land in the western portion of URA 55, south of the City of Hillsboro." 39 Or LUBA at 541. The additional land included 306 acres for which Metro took an exception to Statewide Land Use Planning Goal 3, the Agricultural Lands Goal, and Goal 4, the Forest Lands Goal. The additional land also included 48 acres zoned for exclusive farm use (EFU). "The 354 acres had previously been designated as 'first tier' lands[,]" that is, lands of first priority for inclusion in the UGB.[3] *Id.* Metro also prepared a draft urban reserve

---

[1] Petitioners before LUBA were Citizens Against Irresponsible Growth and Steven Larrance. Walter Hellman and Rick VanBeveren intervened before LUBA on the side of petitioners. For convenience, we use the term "petitioners" to refer to all of those parties.

[2] URA refers to "[l]ands outside of an urban growth boundary identified as highest priority for inclusion in the urban growth boundary when the boundary is expanded in accordance with Goal 14." OAR 660-021-0010(1). *See also* 179 Or App at 14-15 n 3.

[3] According to LUBA, the term "first tier" refers to lands within URAs that Metro determined should be considered for inclusion within a UGB before other urban reserve lands. Ranking of lands for inclusion in a UGB was discussed exten-

concept plan[4] to show that urbanization of the area complied with applicable portions of its own code and Statewide Land Use Planning Goal 2, the Land Use Planning Goal, and Goal 14, the Urbanization Goal.[5]

Following LUBA's decision in *D. S. Parklane Development, Inc. v. Metro*, 35 Or LUBA 516 (1999), *aff'd as modified* 165 Or App 1, 994 P2d 1205 (2000), but before our resolution of the review proceedings in that case, Metro withdrew Ordinance 98-788C for reconsideration. *See* OAR 661-010-0021(2). The Metro Council then adopted Ordinance 99-809, which amended the UGB to include all 306 acres of the exception lands in the western portion of URA 55, and to exclude the 48 acres zoned for EFU. Metro conditioned the conversion of the 306 acres from urbanizable land to urban land available for development on the City of Hillsboro amending its comprehensive plan to include, among other things, the functional classification of the Tualatin Valley (TV) Highway, certain access management strategies, the adoption of level of service requirements, various transportation improvements, and a corridor study for the TV Highway that addressed the maintenance of through-traffic capacity while providing access to and across the highway.

Before LUBA, petitioners' assignments of error challenged Metro's revised UGB amendment on a number of grounds. LUBA rejected all of petitioners' arguments. On review to us, petitioners assign error to many of LUBA's holdings. Our authority to review LUBA's decision is governed by ORS 197.850(9), which provides:

---

sively in *D. S. Parklane Development, Inc. v. Metro*, 165 Or App 1, 994 P2d 1205 (2000).

[4] Metro Code (MC) 3.01.012 no longer requires an urban reserve concept plan.

[5] Goal 2 calls for "**a land use planning process and policy framework as a basis for all decision and actions related to use of land and to assure an adequate factual base for such decisions and actions.**" (Boldface in original.) In addition, it includes criteria to be applied when taking an "exception" to a goal. *See also* ORS 197.732. A Land Conservation and Development Commission (LCDC) rule requires that the exception criteria in Goal 2, Part II, be addressed when amending an acknowledged urban growth boundary. OAR 660-004-0010(1)(c). Goal 14 calls for "**an orderly and efficient transition from rural to urban land use.**" (Boldface in original.) It includes seven factors governing the establishment and change of urban growth boundaries.

> "The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:

> "(a) The order to be unlawful in substance or procedure, but error in procedure shall not be cause for reversal or remand unless the court shall find that substantial rights of the petitioner were prejudiced thereby;

> "(b) The order to be unconstitutional; or

> "(c) The order is not supported by substantial evidence in the whole record as to facts found by the board under ORS 197.835(2)."

Petitioners' assignments of error include numerous challenges to LUBA's decision, not all of which are necessary to address. We discuss some of petitioners' arguments, and we otherwise affirm LUBA's disposition of petitioners' challenges without discussion.

■ Petitioners' first assignment of error on review includes numerous arguments and subarguments. Generally, their arguments relate to their position that LUBA erred in holding that Metro complied with Goal 14 and with the Metro Code provisions implementing it. Specifically, petitioners argue that LUBA erred in concluding that Metro's findings properly addressed factor 3 of Goal 14, which requires that, in making a UGB decision, the "[o]rderly and economic provision for public facilities and services" be considered.[6] LUBA concluded that Metro properly addressed Metro Code (MC) 3.01.020(b)(3) and that that code provision was coextensive with the requirements of Goal 14, factor 3. Petitioners assert here that Metro erred in relying on its code to the exclusion of the goal requirement, because MC 3.01.020(b)(3) is "much narrower and different in scope" from Goal 14, factor 3. The City of Hillsboro responds that petitioners make this argument for the first time on judicial

---

[6] LUBA reasoned, in part: "[T]here is no statutory, goal or rule-based requirement that legislative decisions be supported by findings demonstrating compliance with applicable criteria." *Citizens Against Irresponsible Growth*, 39 Or LUBA at 546 n 7. LUBA cited *Redland/Viola/Fischer's Mill CPO v. Clackamas County*, 27 Or LUBA 560, 563 (1994), in support of that comment. We note that there are some instances where controlling statutes, rules, or ordinances specifically require findings to show compliance with applicable criteria. Also, to permit LUBA and us to exercise our review functions, there must be enough in the way of findings or accessible material in the record of the legislative act to show that applicable criteria were applied and that required considerations were indeed considered.

review. We agree. Petitioners' argument to LUBA simply asserted that Metro failed to adopt findings showing compliance with the goals. Petitioners did not argue that the Metro Code articulated a different standard from that included in Goal 14. We will not consider that argument for the first time on judicial review. *Melton v. City of Cottage Grove*, 131 Or App 626, 887 P2d 359 (1994).

■    We will, however, discuss what appears to be the major theme in petitioners' claims both before LUBA and this court. A number of petitioners' arguments are based on the premise that the factors in Goal 14 must be considered as threshold approval standards: "[T]hat a defect under one [g]oal factor disqualifies a UGB expansion unless consideration of all of the factors together support the amendment[.]" For example, with respect to Goal 14, factor 3, petitioners appear to believe that a local government amending its UGB must find that public facilities and services can and will be economically provided to the area to be included in the UGB before the amendment can be approved. As LUBA explained, however, MC 3.01.020(b)(3) and Goal 14, factor 3, do not stand alone but represent one of several factors to be considered and balanced when amending a UGB. In other words, whether or not the planning jurisdiction amending its UGB finds conclusively that needed public facilities and services can be provided in an orderly and economic fashion does not alone determine whether the amendment should be allowed. The Metro Code provision implementing Goal 14, factor 3, represents a consideration that must be balanced against the other factors. No single factor is of such importance as to be determinative in an UGB amendment proceeding, nor are the individual factors necessarily thresholds that must be met. As LUBA found, in this case, Metro considered the appropriate Goal 14 factors to decide what land might be included in a new or revised UGB. Metro properly did not apply the factors individually as make-or-break mandatory approval criteria. *See Halvorson v. Lincoln County*, 82 Or App 302, 304-05, 728 P2d 77 (1986).

Further, it is significant that, in the UGB amendment before us, Metro's action did not convert rural or urbanizable land to urban use. Additional action will need to be taken to accomplish that result. At that time, a number of the considerations that petitioners believe are pertinent here will

apply. Petitioners' concern that adequate public facilities and services should be established before land is removed from rural status and placed within an urban growth boundary may well be valid from a policy standpoint. However, that approach necessarily elevates one of the Goal 14 factors to prominence over the others. As LUBA concluded, there is no support for that approach in the text or context of Goal 14, or in the authorities construing it.[7]

Petitioners also challenge LUBA's approval of Metro's reliance on the requirements for consideration of alternative sites set out in MC 3.01.020(b), which provides, in relevant part:

> "While all of the following Goal 14 factors must be addressed, the factors cannot be evaluated without reference to each other. Rigid separation of the factors ignores obvious overlaps between them. Demonstration of compliance with one factor or subfactor may not constitute a sufficient showing of compliance with the goal, to the exclusion of the other factors when making an overall determination of compliance or conflict with the goal. For legislative amendments, if need has been addressed, the district shall demonstrate that the priorities of ORS 197.298 have been followed *and that the recommended site was better than alternative sites*, balancing factors 3 through 7." (Emphasis added.)

Petitioners argue that the relative merit of one site over other sites is addressed in Goal 2, Part II, and as set out in OAR 660-004-0010(1)(c)(B). As a consequence, according to petitioners, the Metro Code impermissibly adds a requirement to Goal 14: "that consideration and balancing of the seven factors for the subject site must *also* take into account alternative sites." (Emphasis in original.) Even assuming that they are correct, petitioners do not offer a reason why

---

[7] Petitioners rely on LUBA's opinion in *1000 Friends of Oregon v. City of North Plains*, 27 Or LUBA 372, 389, *aff'd* 130 Or App 406, 882 P2d 1130 (1994), in support of their expansive reading of the requirement of Goal 14, factor 3. LUBA's opinion does not support petitioners' argument. In *City of North Plains*, LUBA rejected the view that Goal 14, factor 3, requires a showing of present "capacity to serve uses to be made of the proposed UGB expansion area in the future." 27 Or LUBA at 389. It said that the local government need only establish "that public facilities and services can reasonably be provided to the UGB expansion area over the planning period[.]" *Id.*

the additional consideration in the Metro Code results in a goal violation. There is nothing in Goal 14 that precludes comparison to alternative sites. An evaluation of the sufficiency of public facilities and services need not be made in a vacuum. We agree with LUBA that Metro's consideration of alternative sites as part of its consideration of the Goal 14 factors did not violate the goals.

Petitioners next argue that LUBA erred in dismissing their assertions that Goals 11 and 12 apply to Metro's decision. Petitioners acknowledge that their argument before LUBA was brief but nonetheless assert that Metro should have addressed the requirements of those goals. As LUBA observed, however, petitioners failed to explain why the challenged decision was inconsistent with those goals. Given their failure to develop that assignment of error before LUBA, we conclude that LUBA did not err in its treatment of petitioners' contentions relating to Goals 11 and 12.

In short, petitioners ask for too much too soon. We reiterate that the matter before LUBA was an amendment to the UGB that involved a conversion from rural to urbanizable land. Neither the goals nor the Metro Code requires demonstration of the adequacy of services, such as petitioners seek, before that conversion may occur. As the City of Hillsboro points out, the decision to include this property within the UGB sets the stage for later, more specific planning decisions. Petitioners' concerns may be pertinent if and when this urbanizable land is considered for conversion to urban land under the second, four-part test established for that purpose in Goal 14.[8] *See 1000 Friends of Oregon v. Wasco County Court*, 299 Or 344, 363-64, 703 P2d 207 (1985).

---

[8] The goal provides that, when converting urbanizable land to urban uses, the local government must consider the:

"(1)  Orderly, economic provision for public facilities and services;

"(2)  Availability of sufficient land for the various uses to insure choices in the market place;

"(3)  LCDC goals or the acknowledged comprehensive plan; and,

"(4)  Encouragement of development within urban areas before conversion of urbanizable areas."

At that later stage of the transition from rural uses to urban uses, the matter of whether the local government can provide for the "[o]rderly, economic provision for public facilities and services" is of far more immediate importance than when

In their second assignment of error, petitioners assert that LUBA erred when it held that Metro's findings under MC 3.01.020(b)(3) were supported by substantial evidence. Before LUBA, petitioners asserted that the TV Highway lacks sufficient capacity to accommodate projected traffic resulting from the UGB amendment and that, as a consequence, the land included in the revised UGB would not be served with adequate transportation services. Petitioners also asserted that the Metro record lacked evidence supporting Metro's findings about the capacity and cost of improving the TV Highway over the 20-year planning period. They contended that Metro improperly rejected evidence showing that the highway has less capacity and will require more expensive improvements than Metro assumed. LUBA found that substantial evidence supported Metro's determinations.

On review, petitioners assert that LUBA erred in concluding that Metro's findings under MC 3.01.020(b)(3) were supported by substantial evidence. Most of petitioners' argument concerns the alleged inadequacy of the TV Highway as a transportation corridor for the area and an alleged failure of the Kittelson Report to properly analyze transportation services to the newly included lands.[9] Apparently the Kittelson Report considers a much larger area than that subject to the UGB amendment. Because of that, petitioners do not believe that it is sufficiently focused to provide evidentiary support for Metro's conclusions. Petitioners also challenge the conditions that Metro imposed calling for additional transportation planning and improved transportation facilities. Petitioners argue that the conditions do not address the problems and, further, that the conditions do not ensure that the improvements will actually be built.

___

considering rural land for inclusion in an urban growth boundary. That conversion only provides the possibility that such land will someday be urbanized. Petitioners' arguments would accelerate the process by placing that second and more immediate concern for public facilities and services in place of that more general consideration under the seven Goal 14 factors relevant to a transition from rural to urbanizable land.

[9] According to LUBA, the Kittelson Report is a transportation study prepared by Kittelson and Associates. *Citizens Against Irresponsible Growth*, 39 Or LUBA at 552.

■ The City of Hillsboro responds that it is not this court's function to review a sufficiency of the evidence challenge *de novo*. We agree. Our role is to determine whether LUBA applied the correct legal test in deciding whether Metro's decision is supported by substantial evidence. *Von Lubken v. Hood River County*, 133 Or App 286, 289, 891 P2d 5 (1995); *Cusma v. City of Oregon City*, 92 Or App 1, 6-7, 757 P2d 433 (1988). Petitioners' complaints about the Kittelson Report address its methodology. Petitioners assert that the report and other facts about the transportation facilities available to serve the newly included area do not show that adequate transportation services can be provided. Those assertions, however, do not persuade us that LUBA failed to apply the substantial evidence test correctly, nor are we persuaded that the conditions imposed by Metro are improper or inadequate.

■ In their third assignment of error, petitioners argue that LUBA erred in concluding that Metro's UGB amendment did not significantly affect a transportation facility within the meaning of OAR 660-012-0060(1) and (2), which provide, in relevant part:

"(1)    Amendments to functional plans, acknowledged comprehensive plans, and land use regulations which significantly affect a transportation facility shall assure that allowed land uses are consistent with the identified function, capacity, and performance standards (e.g. level of service, volume to capacity ratio, etc.) of the facility. * * *

"* * * * *

"(2)    A plan or land use regulation amendment significantly affects a transportation facility if it:

"(a)    Changes the functional classification of an existing or planned transportation facility;

"(b)    Changes standards implementing a functional classification system;

"(c)    Allows types or levels of land uses which would result in levels of travel or access which are inconsistent with the functional classification of a transportation facility; or

"(d)   Would reduce the performance standards of the facility below the minimum acceptable level identified in the TSP."[10]

LUBA concluded that petitioners failed to show that the challenged amendment of the UGB "significantly affects" a transportation facility within the meaning of the rule. LUBA held that the amendment did "not alter the types or intensity of allowed land uses, reduce the performance standards of transportation facilities, or otherwise significantly affect any transportation facility." *Citizens Against Irresponsible Growth*, 39 Or LUBA at 555.

On review, petitioners contend that the amendment "changes standards implementing a functional classification system and allows types and levels of land uses which would result in levels of travel which are inconsistent with the functional classification of a transportation facility." Petitioners acknowledge that the city must address Transportation Planning Rule[11] requirements when converting land from urbanizable to urban, but argue that "that is a poor way to conduct land use planning." Petitioners want the rule requirements to be addressed now rather than to wait and risk the possibility that the rule will not permit the densities that Metro believes necessary. Petitioners' argument is essentially that OAR chapter 660, division 012, should be revised. We agree with LUBA that the rule does not apply to this UGB amendment.

**5.**     Finally, petitioners' fourth assignment of error concerns whether LUBA erred when it held that Metro was not required to make express findings demonstrating compliance with the requirements of Goals 2 and 14. LUBA concluded that Metro's findings addressed MC 3.01.015 and MC 3.01.020, its code provisions implementing Goals 2 and 14. LUBA noted that, in *Residents of Rosemont v. Metro*, 38 Or LUBA 199 (2000), *rev'd in part on other grounds* 173 Or App

---

[10] A "TSP" is a Transportation System Plan. *See* OAR 660-012-0005(32) (defining the plan as "a plan for one or more transportation facilities that are planned, developed, operated and maintained in a coordinated manner to supply continuity of movement between modes, and within and between geographic and jurisdictional areas").

[11] OAR chapter 660, division 012, is a LCDC rule compilation that implements Goal 12 and is known as the Transportation Planning Rule.

321, 21 P3d 1108 (2001), it determined that MC 3.01.015 and MC 3.01.020 "replicate the substance and in many instances the precise language of Goals 2 and 14," and noted that petitioners here "have not identified any particular in which the decision fails to comply with those goals." *Citizens Against Irresponsible Growth,* 39 Or LUBA at 545. We agree with LUBA that Metro's findings were sufficient.

Affirmed.