Argued and submitted April 18, affirmed on petition and cross-petition
May 29, 1996

OPUS DEVELOPMENT CORPORATION;
Thomas R. Slocum; Charles F. Larson, Jr.;
Downtown Mini-Storage; Lynn Klingensmith;
Donald C. McRae; Saylor Painting Co.;
Ronald D. Saylor; John P. Hammer;
Bel Hardware; Rodney L. Bell; Jerry Davis;
Scharpf's Twin Oaks Builders Supply Co.;
Tad Scharpf; Builders Electric; Frederick Wittkop;
Starwood Products; Gary Kayser;
Ivy Hi-Lift; Ronald J. Howard,
*Respondents - Cross-Petitioners,*

*v.*

CITY OF EUGENE,
*Petitioner - Cross-Respondent,*

*and*

Jesse SPRINGER
and Raimon Franck,
*Respondents.*

(LUBA No. 95-104; CA A92059)

918 P2d 116

Jens Schmidt argued the cause for petitioner - cross-respondent. On the brief were Glenn Klein and Harrang Long Gary Rudnick P.C.

Allen L. Johnson argued the cause for respondents - cross-petitioners. With him on the brief was Johnson, Kloos & Sherton, P.C.

No appearance for respondents Jesse Springer and Raimon Franck.

Before Deits, Presiding Judge, and Warren and Haselton, Judges.

DEITS, P. J.

.

**DEITS, P. J.**

The City of Eugene seeks review of, and respondents[1] cross-petition from, LUBA's decision remanding a series of ordinances and orders by the city that, among other things, amended the "refinement plan" for the Whiteaker neighborhood. The city's actions entailed amendments to the Eugene-Springfield Metropolitan Area General Plan Diagram (general plan), of which the neighborhood refinement plans and inventories discussed here are a part. The actions also included decisions of a more operational and less comprehensive nature. The city assigns error to LUBA's rejection of its application of Goal 9 (Economy Goal). Respondents assign error to LUBA's deferring to and approving the city's interpretation of various plan and regulatory provisions, which resulted in its designating the West Skinner Butte area as medium density residential. We affirm on the petition and the cross-petition.

Goal 9, paragraph 3 requires that urban area comprehensive plans:

"Provide for at least an *adequate supply of sites* of suitable sizes, types, locations, and service levels for a variety of industrial and commercial uses consistent with plan policies." (Emphasis supplied.)

*See also* ORS 197.712(2)(c). LUBA concluded that the city did not comply with paragraph 3 of Goal 9, because in its assessment of whether, after the amendment, the plan still provided an "adequate supply of sites," the city considered and inventoried only vacant, buildable commercial and industrial sites, rather than also including developed commercial and industrial land located in the affected areas.

The city argued below and argues here that the goal only requires it to consider the impact on "vacant and significantlyunderutilized lands." It relies, for its narrow reading of the requirements of Goal 9, on OAR 660-09-015(3), a rule adopted by LCDC to implement Goal 9. That rule provides:

---

[1] Respondents were the petitioners before LUBA. We refer to them as they are designated in this court. Respondents Springer and Franck have not appeared, and we do not include them in our references.

"Inventory of Industrial and Commercial Lands. Comprehensive plans for all areas within urban growth boundaries shall include an inventory of vacant and significantly underutilized lands within the planning area which are designated for industrial or commercial use."

The city contends that, in assessing whether a plan provides for an "adequate supply of sites," it need only consider the land identified in the inventory prepared pursuant to OAR 660-09-015(3).

LUBA disagreed with the city's reading of Goal 9 and the effect of OAR 660-09-015(3). It concluded that the supply of sites to which Goal 9 refers is not the same as the land required to be inventoried under OAR 660-09-015(3). LUBA read the reference in Goal 9 to "an adequate supply of sites" to include a broader category of land than that required to be inventoried by the rule; it includes "redevelopable" as well as vacant land.

In reaching its conclusion, LUBA relied on the language of the goal itself as well as another section of the Goal 9 implementing rules, OAR 660-09-015(2). That section provides:

"Site Requirements. The economic opportunities analysis shall identify the types of sites that are likely to be needed by industrial and commercial uses which might expand or locate in the planning area. Types of sites shall be identified based on the site requirements of expected uses. Local governments should survey existing firms in the planning area to identify the types of sites which may be needed for expansion. Industrial and commercial uses with compatible site requirements should be grouped together into common site categories to simplify identification of site needs and subsequent planning."

LUBA explained, *inter alia*:

"Goal 9, paragraph 3, upon which we relied [in an earlier remand order], refers to 'an adequate supply of sites of suitable sizes, types, locations, and service levels.' It is not limited to vacant, buildable commercial sites.

"* * * * *

"Our remand order was not limited to the 'inventory of vacant and significantly underutilized lands' mentioned in OAR 660-09-015(3). The use of the word 'inventory' in different contexts, with different meanings, is initially confusing, but it provides no support for the city's position.

"Moreover, the city's position ignores the fundamental relationship between developed and undeveloped land and the contribution each makes to satisfying the overall need for commercial (and industrial) land. Developed land was considered at the time the city determined its inventory of vacant, buildable commercial land was adequate. If developed land is now left out of the equation, the pressure on vacant, buildable commercial land will increase. In its demonstration, required by our remand order in [the earlier case] that its inventory of commercial sites is adequate with regard to size, type, location and services levels, the city cannot ignore the connection between restricting uses on existing commercial lands and the pressure that places on its inventory of vacant, buildable commercial land."

■ We agree with LUBA's reasoning and conclusions. There is nothing in the language of OAR 660-09-015(3) that limits the supply of land to be considered under Goal 9 to the land required to be inventoried under that rule. Considering the language of Goal 9 in context, in particular OAR 660-09-015(2), the term "adequate supply of sites" includes a broader category of land than "vacant and significantly underutilized" land.

■ The city also asserts that LUBA erred by rejecting its interpretation of certain city comprehensive plan provisions as supporting the position that only the unused sites had to be inventoried and considered. Although respondents' answer is extensive, the dispositive part of it is brief: the city actions that are involved in its assignment of error to us do not concern permits or similar applications of acknowledged land use legislation, "but are post-acknowledgment amendments to comprehensive plans and land use regulations." As such, the city decisions are reviewable for direct compliance with the goals, ORS 197.175(2)(e); ORS 197.835(6), not with the plan. As we have held, the city's decisions violate Goal 9, and therefore, we reject its assignment of error.

■     In their cross-petition, respondents also raise a question concerning LUBA's disposition of the city council's interpretation of city legislation. In this instance, the city's action involved an interpretation of acknowledged plan and regulatory provisions, not an amendment to them. The decision is therefore subject to and reviewable for compliance with the acknowledged local legislation, ORS 197.175(2)(d); ORS 197.835(8).

The city interpretation that respondents challenged before LUBA was that the designation of a specific area by the city's plan and regulations was medium density rather than high-density residential. Suffice it to say that the interpretation turned on a determination of which of several possible general plan, refinement plan or plan diagram designations was applicable. In addition to other points, respondents contended to LUBA that the interpretation was reversible under ORS 197.829(1)(c) (inconsistency with underlying policy of interpreted provision) and ORS 197.829-(1)(d) (contrary to statewide land use planning goals or other state provisions). In their brief to LUBA, respondents' amplification of their ORS 197.829(1)(d) argument consisted of references to and cursory summaries of the requirements of the housing goal (Goal 10) and three others. LUBA concluded that the "arguments are not sufficiently developed to establish that the city's interpretation is contrary to the goals." Respondents argue that that conclusion was erroneous.

■     The initial question is whether respondents' ORS 197.829(1)(d) argument is reviewable. We held in *Friends of Neabeack Hill v. City of Philomath*, 139 Or App 39, 911 P2d 350, *rev den* 323 Or 136 (1996),[2] that, in the review of a local land use decision to which an acknowledged comprehensive plan or regulatory provision is applicable, ORS 197.829(1)(d) does not enable LUBA or us to consider a *goal* consistency challenge to a local interpretation of the provision if: (1) the local government's interpretation is a correct statement of

---

[2] Respondents state that our opinion in *Friends of Neabeack Hill* "has some of the qualities of a Godel-Escherbach etching." We assume that the intended reference is to the artist M.C. Escher alone, and not to the mathematician Godel or the composer Bach. Although Godel and Bach, along with Escher, were the subjects of and named in the title of a scholarly treatise by Douglas Hofstadter, neither Godel nor Bach created any noteworthy graphic artistic work of which we are aware.

the meaning of the provision; (2) the challenge depends in substance on a showing that the acknowledged provision itself, as distinct from the interpretation of it, is contrary to a goal; and (3) a direct assertion that the acknowledged provision is inconsistent with the goal would not be cognizable under ORS 197.835.

Because respondents' ORS 197.829(1)(d) argument is not specifically developed, we cannot tell whether or not it falls within those parameters. We do emphasize, however, that *Friends of Neabeack Hill* states a narrow exception to the operation of ORS 197.829(1)(d). It should not be understood to suggest that the statute is not *generally* applicable according to its terms.

■■ As indicated in the preceding paragraph, however, we agree with LUBA that respondents' ORS 197.829(1)(d) argument is not developed to the point where it *can* be reviewed. Respondents argue that LUBA's holding effectively eviscerates ORS 197.829(1)(d), and that "[t]he statute does not place a burden of proof" on persons challenging a local interpretation. However, ORS 197.829 is not concerned with proof; rather, it defines a standard of review of a particular aspect of local decisions in the LUBA appellate process. A party challenging the decision must provide some particularized basis for showing it to be reversible. Respondents have not done so here under their ORS 197.829(1)(d) argument. We reach the same conclusion, without discussion, concerning the ORS 197.829(1)(c) prong of their argument.

Affirmed on petition and cross-petition.