Argued and submitted August 15, affirmed October 31, 2001

SAVE OREGON'S CAPE KIWANDA ORGANIZATION,
Carolyn Germane, and John L. Tenny,
*Petitioners,*

*v.*

TILLAMOOK COUNTY
and Nestucca Ridge Development, Inc.,
*Respondents.*

2001-021; A114954

34 P3d 745

Christine M. Cook argued the cause and filed the brief for petitioners.

Michael Robinson argued the cause for respondent Nestucca Ridge Development, Inc. With him on the brief were Ellen Hawes and Stoel Rives LLP, and Jeannette M. Launer.

No appearance for respondent Tillamook County.

Before Armstrong, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioners seek review of a Land Use Board of Appeals (LUBA) decision affirming Tillamook County's approval of a conditional use permit allowing the development of a hotel project near the unincorporated community of Pacific City on the Oregon coast. We affirm.

We take the facts from LUBA's opinion. Respondent on review, and applicant before the county, Nestucca Ridge Development, Inc. (Nestucca Ridge) sought the modification of a conditional use permit from Tillamook County allowing it to build a hotel on a roughly crescent shaped property fronting the Pacific Ocean. The subject property is made up of tax lots 1500 and 1501. The western property boundary is the Oregon Coordinate Line (OCL), the boundary line between public and private ownership of Oregon beaches. This western boundary is straddled by a line of riprap paralleling the shore line. The riprap structure was placed on this site around 1970. The property slopes gently upward from the beach to a topographic bench. The bench is in the center of the property and is the site of the proposed hotel project. The eastern and northern boundaries of the property are framed by a steep slope.

In 1996, the county approved a conditional use permit for a hotel to be developed in two phases. Phase I of the project has been completed on property to the east of the subject parcel. Nestucca Ridge sought approval to modify the conditional use permit to allow it to reconfigure the Phase II site plan to construct the proposed hotel on tax lot 1501 as an additional phase of the project. As LUBA explained, the project required three approvals: (1) approval of the modified conditional use permit for the hotel; (2) a determination of the development's oceanfront setback lines; and (3) review and approval of a geologic hazard report. Following internal appeals, the Tillamook County Board of Commissioners approved the proposal. Petitioners appealed the approval to LUBA, and LUBA affirmed the county's decision.

In their first assignment of error to us, petitioners argue that LUBA's decision is unlawful in substance. They assert that LUBA committed legal error in concluding that

the county had demonstrated compliance with Tillamook County Land Use Ordinance (LUO) 3.085(4)(A)(1)(a). Petitioners make a number of arguments in this assignment of error.

The critical land use ordinance here is LUO 3.085. That ordinance applies in this case because the property is in the county's "Beach and Dune Overlay Zone." LUO 3.085(4)(A)(1) provides that permitted uses within the overlay zone include commercial developments, such as hotels, but such developments are allowed

> "only in areas classified as *stabilized foredune or conditionally stable foredune not subject to ocean undercutting or wave overtopping*, or in areas where an exception has been taken to the prohibitions contained in Goal 18 implementation requirement (2)." LUO 3.085(4)(A)(1)(a) (emphasis added).

The parties agree that the sand formation underlying the subject property is a foredune. LUBA opined, and the parties do not appear to disagree, that, while there is no definition of "foredune" in the statewide planning goals, the term refers to a dune located at the landward margin of a beach. The Department of Land Conservation and Development (DLCD) has defined a number of terms in materials it publishes with the Statewide Planning Goals. Although those definitions have not been adopted as OARs, we find them helpful. A "dune" is defined as a "hill or ridge of sand built up by the wind along sandy coasts." Other relevant definitions specify different types of dunes:

> "**DUNE, ACTIVE**. A dune that migrates, grows and diminishes from the effect of wind and supply of sand. Active dunes include all open sand dunes, active hummocks, and active foredunes.

> "**DUNE, CONDITIONALLY STABLE**. A dune presently in a stable condition, but vulnerable to becoming active due to fragile vegetative cover.

> "**DUNE, OLDER STABILIZED**. A dune that is stable from wind erosion, and that has significant soil development and that may include diverse forest cover. They include older foredunes.

"**DUNE, OPEN SAND**. A collective term for active, unvegetated dune landforms.

"**DUNE, RECENTLY STABILIZED**. A dune with sufficient vegetation to be stabilized from wind erosion, but with little, if any, development of soil or cohesion of the sand under the vegetation. Recently stabilized dunes include conditionally stable foredunes, conditionally stable dunes, dune complexes, and younger stabilized dunes.

"**DUNE, YOUNGER STABILIZED**. A wind-stable dune with weakly developed soils and vegetation.

"\* \* \* \* \*

"**FOREDUNE, ACTIVE**. An unstable barrier ridge of sand paralleling the beach and subject to wind erosion, water erosion, and growth from new sand deposits. Active foredunes may include areas with beach grass, and occur in sand spits and at river mouths as well as elsewhere.

"**FOREDUNE, CONDITIONALLY STABLE**. An active foredune that has ceased growing in height and that has become conditionally stable with regard to wind erosion.

"**FOREDUNE, OLDER**. A conditionally stable foredune that has become wind stabilized by diverse vegetation and soil development."

LUBA agreed with the county that the site of the hotel project, the bench area 60 feet landward of the OCL, is composed of "younger stabilized dunes,[1] not subject to wave undercutting or overtopping,"[2] and, therefore, the approval of the conditional use permit was consistent with LUO 3.085(4)(A)(1)(a). Petitioners raise a number of different problems with this holding.

---

[1] LUBA did not question the county's unstated but apparent view that a "younger stabilized dune" is the equivalent of a "conditionally stable foredune" for the purpose of the county's Beach and Dune Overlay Zone. The county does not articulate its reasoning for this classification, but we presume that it arrived at that conclusion because both "conditionally stable foredune" and "younger stabilized dune" fall within the general classification of "recently stabilized dune."

[2] In support of this determination, LUBA relied on evidence furnished by Nestucca Ridge's expert to the effect that the "benched area" where the hotel is to be sited consists of "primarily younger stabilized dune."

■ ■ First, petitioners assert that LUO 3.085 requires that, in deciding if the property includes the type of dune on which commercial development may be permissible, the entire foredune must be evaluated, or at least the entire property—in this case, all of tax lot 1501. It is petitioners' view that, if any part of the dune or the property is an active foredune, then no development may be permitted on the property. LUBA rejected this assertion. It explained:

"[Nestucca Ridge] is correct that the county limited its determination to the 'site' rather than the entire subject property. To the extent petitioners suggest that either LUO 3.085 or Goal 18 requires the county to evaluate the character of the entire subject property, or the entire foredune underlying the subject property and others, we reject the suggestion. LUO 3.085 requires that the county allow development 'only in areas' classified as stabilized or conditionally stable. The 'area' the county considered was the benched area on the subject property on which development is proposed. Petitioners have not demonstrated that either LUO 3.085 or Goal 18 requires a more expansive evaluation. As the evidence in this case illustrates, dune formations can encompass a wide geographic area and have multiple characteristics. Petitioners' view of the pertinent scope of consideration would require that the county prohibit development on even older stabilized areas of a foredune, merely because another area of the foredune is in an active condition, or subject to ocean undercutting or wave overtopping. While that view of Goal 18 is not implausible, we see nothing in Goal 18 that supports, much less compels, that interpretation."

We begin our discussion of this question by noting that LUBA and the courts must affirm a local government's interpretation of its own ordinance unless LUBA or we determine that the local government's interpretation is inconsistent with the express language of the ordinance, considered in its context, or with the apparent purpose or policy of the ordinance. ORS 197.829(1); *Clark v. Jackson County,* 313 Or 508, 515, 836 P2d 710 (1992).

The county ordinance states that development is "permitted only in *areas* classified as stabilized foredune or conditionally stable foredune not subject to ocean undercutting or wave overtopping[.]" LUO 3.085(4)(A)(1)(a) (emphasis

added). The meaning of the term "area" is not entirely clear from the text of the ordinance. It could be understood to refer to broad dune areas, all of a particular parcel of land (here, tax lot 1501) or only the specific area of the property on which development is proposed. The county interpreted the term to mean the specific part of the property where the proposed development will occur.

As did LUBA, we conclude that it is not inconsistent with the language used in the ordinance to interpret the term "area" to mean the area of the specific project. Further, other parts of the ordinance, such as the locational requirements, focus on the *site* of a development and on the proposed development's impacts on surrounding areas. LUO 3.085. The text and context provide support for the county's interpretation of its ordinance. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993); *Lincoln Loan Co. v. City of Portland*, 317 Or 192, 199, 855 P2d 151 (1993) (rules that govern construction of statutes also govern construction of municipal ordinances). LUBA did not err in sustaining the county's interpretation of its ordinance.

██ Petitioners also argue that the specific dune types of different areas of the dune, or different parts of tax lot 1501, are not clearly demarcated and that, without this information, the county could not have concluded that the project complied with LUO 3.085(4)(A)(1)(a). However, as discussed above, the county's treatment of the bench area proposed for the actual development here as the "area" to be considered under LUO 3.085(4)(A)(1)(a) was not improper under the county's reading of its ordinance. Consequently, even if it is correct that the appropriate dune types for other parts of the dune area on the property are not demarcated, it does not matter because, as explained by LUBA, the bench area is not an active foredune or "open dune sand":[3]

> "Nothing in that testimony, or other evidence cited by petitioners, indicates that the benched area on which development is proposed can be classified as an active foredune or 'open dune sand.' Although the county's decision does not

[3] We understand this term to refer to active, unvegetated dunes. See the DLCD definitions set out above. 177 Or App at 350-51.

demarcate the portions of the benched area that are classified as 'younger stabilized dune' from those classified as 'conditionally stable,' petitioners have not demonstrated that failure to do so could result in development on portions of the subject property on which development is prohibited, *i.e.*, on portions classifiable as active foredune or 'open dune sand.' Development in areas classified as either 'younger stabilized dune' or 'conditionally stable' is permitted, provided that the area is not subject to ocean undercutting or wave overtopping."

Petitioners also argue that the county's interpretation of LUO 3.085 is inconsistent with Statewide Planning Goal (Goal) 18,[4] and that, even though the county ordinance was acknowledged to comply with Goal 18, under ORS 197.829(1)(d),[5] the county's ordinance may not be construed in a manner inconsistent with Goal 18. ORS 197.829 provides, in part, that:

"(1)   The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"* * * * *

"(d)   Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements."

Petitioners contend that the county's interpretation is not consistent with a land use goal, namely Goal 18. Specifically, petitioners rely on Implementation Requirement (IR) 2 of the goal, which states, in relevant part:

"Local governments and state and federal agencies shall prohibit residential developments and commercial and industrial buildings on beaches, active foredunes, on other

---

[4] Nestucca Ridge complains that petitioners did not raise a Goal 18 argument before LUBA and should not be permitted to do so on review. However, LUBA must have believed that petitioners made this argument, because it addressed the issue. We therefore consider it on review.

[5] LUBA apparently treated the challenge as one directed at the county's *interpretation* of its ordinance and not as a collateral attack on the ordinance's consistency with Goal 18. *See OPUS Development v. City of Eugene*, 141 Or App 249, 918 P2d 116 (1996).

foredunes which are conditionally stable and that are subject to ocean undercutting or wave overtopping, and on interdune areas (deflation plains) that are subject to ocean flooding."

Petitioners contend that this goal language

"speak[s] of entire features. To construe IR 2, LUO 3.085, and the county's decision as [Nestucca Ridge] urged, and as LUBA did, to permit development on a portion of a foredune, when some portion of the foredune that was never actually located by the county cannot be developed, is contrary to the Goal and the ordinance."

The language of Goal 18 is imprecise. However, as LUBA points out, dune formations can encompass wide geographic areas with multiple characteristics. If Goal 18 were read to prohibit development on any part of a dune area or any part of property that has some areas that are unacceptable for development, even if the specific project site could be developed without unacceptable impacts on other parts of the property or dune, development would be severely limited. The provisions of Goal 18 do not contemplate such a broad blanket prohibition on development. Rather, Goal 18 appears to anticipate that some development will occur. The goal focuses on limiting development to specific sites that are themselves acceptable for development and that can be developed without impact on adjacent property. For example, Goal 18's general purpose statement provides:

"Uses shall be based on the capabilities and limitations of beach and dune *areas* to sustain different levels of use or development, and the need to protect areas of critical environmental concern, areas having scenic, scientific, or biological importance, and significant wildlife habitat * * *."

Goal 18's implementation requirements set out decisional criteria that call for local governments to address proposed developments and their effect on dune areas. The criteria in the implementation requirements also contemplate development on specific sites that are appropriate for development and that will not adversely affect adjacent areas:

"1.    Local governments and state and federal agencies shall base decisions on plans, ordinances and land use

actions in beach and dune areas, other than older stabilized dunes, on specific findings that shall include at least:

"(a) The type of use proposed and the adverse effects it might have on the *site* and adjacent areas;

"(b) Temporary and permanent stabilization programs and the planned maintenance of new and existing vegetation;

"(c) Methods for protecting the surrounding area from any adverse effects of the development; and

"(d) Hazards to life, public and private property, and the natural environment which may be caused by the proposed use." (Emphasis added.)

We can find nothing in the goal language that imposes a general prohibition on development on otherwise suitably stable sites that happen to lie within general areas of unstable dunes. Rather, the goal seeks to ensure that development be limited to sites suitable for development where projects will not cause "adverse effects" on the "surrounding area." We understand the reference to "surrounding area" to include both areas of stable and unstable dune. We conclude that the county has not interpreted its ordinance in a manner that is inconsistent with Goal 18.

■ Petitioners next argue that LUBA erred in agreeing with the county's finding that the site was not subject to ocean undercutting and wave overtopping both because (1) Goal 18 does not allow the consideration of an unnatural feature, such as riprap, in deciding if the area is subject to wave overtopping or ocean undercutting, and (2) the conclusion lacked evidentiary support. However, we agree with LUBA that there is nothing in Goal 18 that prevents the county from construing its ordinance to allow the consideration of the effect of existing structures on the property.

■ Petitioners also contend that LUBA incorrectly applied the substantial evidence test, because, considering the record as a whole, a reasonable person could not conclude that no ocean undercutting or wave overtopping was occurring on the property. *See Younger v. City of Portland*, 305 Or 346, 752 P2d 262 (1988). In arguing that there is nothing in the record that would allow a reasonable person to reach the

conclusion that the county did, petitioners first criticize the county's reliance on a December 2000 letter by one of Nestucca Ridge's geologists that explains the difference between the reports that he helped to prepare in March 1998 and June 2000. According to petitioners, the reports are inconsistent with respect to dune stability and regarding the possibility that storms will damage the riprap structure. Petitioners insist that the only reasonable conclusion that can be drawn from the two reports is that ocean storms will cause the foredune involved here to retreat because of undercutting. Petitioners discount the December 2000 letter from Nestucca Ridge's geologist explaining why there is no inconsistency between the two reports. Petitioners also take issue with the geologist's conclusion in the 2000 report stating that the riprap could effectively fix the shoreline position, because it could be repaired following a storm.

The December 2000 letter from the consulting geologist states that it is important to note that

> "the March 1998 areawide report was an assessment of the factors affecting shoreline stability within the foredune area fronting the entire rural community of Pacific City - it encompasses ~20,000 feet of shoreline. The June 1997 site report and June 2000 site report pertain specifically to Tax Lot #1501[6] - they encompass ~500 feet of shoreline."

The December letter also addresses the matter of storm damage to the riprap and concludes that the structure will be damaged by storms but should resist "moderate wave attack." The letter explains that, in a severe wave attack, the structure is expected to be damaged but not to be completely destroyed. In testimony before the county, the geologist stated that he understood that the structure could be repaired and concluded that "we can fix the position of that shoreline by maintaining the existing structure." The county adopted that view in its decision, stating that it was "convinced that the rip-rap and its possible repair effectively fix the position of the shoreline and therefore the site is not subject to wave undercutting."

---

[6] As previously noted, tax lot 1501 is the site of the proposed development.

■      LUBA concluded that the county's findings were supported by substantial evidence. It explained:

> "Petitioners contend that the county's finding that the site is not subject to ocean undercutting or wave overtopping is not supported by substantial evidence. The lynchpin of the evidence supporting the county's finding on this point is the presence of the riprap along the western boundary of the property. [Nestucca Ridge's] experts testified that the riprap will effectively fix the position of the shoreline, and the potential landward extent of ocean undercutting will be minimal, assuming that the riprap is repaired if it is damaged during storm events. Petitioners argue that that testimony is inconsistent with other evidence in the record, including earlier studies conducted by the same experts. Further, petitioners argue that [Nestucca Ridge's] evidence assumes, without justification, that if the riprap is damaged during storm events it would be repaired in a manner or within a time frame that would prevent any undercutting and retreat of the dune.
>
> "We agree with [Nestucca Ridge] that substantial evidence supports the county's findings on this point. The choice between conflicting evidence is up to the county, as long as a reasonable person could reach the decision the county does, considering the evidence in the record as a whole. *Angel v. City of Portland*, 22 Or LUBA 649, 659, *aff'd* 113 Or App 169, 831 P2d 77 (1992); *Wissusik v. Yamhill County*, 20 Or LUBA 246, 260 (1990). Based on the evidence in the record as a whole, a reasonable person could conclude that the riprap is adequate to ensure compliance with LUO 3.085. Further, petitioners cite no basis to question the assumption that [Nestucca Ridge] can and will make timely repairs to the riprap if it is damaged, and we see no evidentiary defect in that regard."[7] (Footnote omitted.)

Our review of a LUBA conclusion regarding whether a finding is supported by substantial evidence is confined to examining whether LUBA correctly applied the test. *Cusma v. City of Oregon City*, 92 Or App 1, 6-7, 757 P2d 433 (1988). LUBA explained that the choice between conflicting evidence

---

[7] We note that there appears to be more than an assumption that the riprap will be repaired. The county included a condition in the permit approval that the standards in the geologic hazard report be followed. The report includes recommendations that the riprap be maintained and repaired if damaged.

is up to the county, provided that a reasonable person could agree with the county's conclusion after considering the evidence in the whole record. The fact that petitioners, or even we, might as factfinders reach a different conclusion based on the same evidence does not mean that LUBA erred in its review of the local decision for substantial evidence. LUBA correctly applied the substantial evidence test.

■ Petitioners' second assignment of error is that LUBA erred in failing to determine that, in approving the conditional use permit, the county violated LUO 3.085(4)(A)(1)(c)(3). That subsection of the county ordinance requires that the county planning director require greater setbacks from the ocean than otherwise required under the county's ordinance "where there is evidence of significant coastal, environmental, or geologic hazards." Although petitioners argue that LUBA erred, as a matter of law, in sustaining the county's application of its ordinance, petitioners' argument rests on their view that the evidence in the record shows that the property is subject to geologic hazard. In petitioners' view, the planning director should have set the line in a different position as a result of those hazards.

The county ordinance establishes an Oceanfront Setback Line (OSL) that determines how close to the ocean certain structures may be sited. Under LUO 3.085(4)(A)(1)(c)(1), the OSL "is landward of the crest of the active foredune and is approximately parallel to the Oregon Coordinate Line." The county's findings explain that its ordinance sets the exact location of the OSL depending on the location of oceanfront buildings near the proposed structure and upon location of the OCL. Under LUO 3.085(4)(A)(1)(c)(2), the planning director may depart from the numeric standards in the ordinance and determine the setback distance individually in cases where geologic hazard or protection of ocean views of existing development require greater setbacks. The county interpreted the planning director's authority to permit what amounts to a kind of variance from ordinance standards where the strict application of the prescribed method for establishing the OSL leads to an unreasonable and inequitable result.[8]

---

[8] LUO 3.085(4)(A)(1)(c)(2) states, in part:

Petitioners contend that, if the ordinance were applied properly, the OSL would have been set at 105 feet landward of the OCL. The county set the line at 60 feet. Petitioners do not fully explain the basis for their calculation, but we note that the county's findings recite that there are two structures approximately 105 feet east of the OCL and some distance south of the subject parcels. Unless the OSL is set by the planning director, the ordinance requires that the setback line be based on the setback distance of neighboring structures. The county's decision explains that the planning director exercised his authority under LUO 3.085(4)(A)(1)(c)(2) and established the setback line at its 60 foot location because

> "applying the strict calculation method of determining the OSL to [Tax Lot] 1501 produces an unreasonable and inequitable result as follows: The calculation method of determining the OSL results in a setback line that crosses Tax Lot 1501 above the level benched area on the parcel. Construction behind the [OSL established under strict application of the ordinance] would be on steeply sloping areas which are less suitable for development due to risk of unnecessary slope disturbance and impacts to surrounding properties. [Petitioners] have argued that the 105' setback is necessary to provide protection from geologic hazards and to lessen visual impact of development on the beach. However, the Board has heard no convincing evidence that a 105' setback is necessary for protection from geologic hazards, nor that siting a development higher on the slope will improve views from the beach. Therefore, limiting development to the area behind the [OSL established under strict

---

"In cases where the above method of OSL determination requires development to be set back further from the Beach Zone line than is required by geologic hazards or protection of the ocean view of existing development on oceanfront property, the Planning Director may determine the setback distance which will apply. The intent of this provision is to limit this application of the Director's discretion to those rare and unusual circumstances where the above method of determining the OSL produces an unreasonable and inequitable result. * * *

"Upon finding that the purposes of the landward yard setback will still be achieved, the Director also may reduce the landward yard setback to no less than 10 feet. The Director's decision shall be made pursuant to the standards and criteria set forth in this section and any other standards or regulations which may apply."

application of the ordinance] is unreasonable due to the topography and risk to surrounding areas."

Petitioners do not argue that the planning director lacked the authority to make the change in the OSL. Their contention that a different OSL should have been established depends on their assertion that the county's treatment of ocean hazards is not supported by substantial evidence. We have already rejected petitioners' argument on this issue. Consequently, there is no basis for concluding that LUBA erred in its rejection of petitioners' complaints about the planning director's establishment of the 60-foot OSL.

■ In their final assignment of error, petitioners allege that LUBA erred in failing to conclude that the county violated LUO 4.070(6)(a) and Goal 18 by not requiring the applicant to present a geologic hazard assessment with information on "bedding planes." Petitioners do not explain the significance of bedding planes other than to say that, without information on the orientation of bedding planes, the assessment is deficient and cannot form a basis for determining whether development on the property is appropriate.

Neither LUBA nor the parties define "bedding planes," but we understand from testimony in the record that the term refers to subsurface layers that are indicative of landslide hazards. The county's decision cites a geologic hazard assessment that mentions bedding planes in the general area. One of Nestucca Ridge's geologists testified that an examination of the property revealed no bedding planes on the subject property.

LUBA agreed with Nestucca Ridge's argument that LUO 4.070(6) states an informational requirement. The ordinance requires a geologic hazard report (or analysis) to include information on soils, slope, orientation of bedding planes, soil depth and other information. LUO 4.070(6)(a)(1)-(7). LUBA rejected petitioners' concern on the ground that petitioners did not demonstrate how a failure to include evidence on bedding planes in the geologic hazard assessment rendered the county's findings under other ordinance provisions, regarding hazardous conditions, deficient. LUBA also found that petitioners were mistaken in that the geologic hazard assessment did address bedding planes. Further,

LUBA also relied on testimony in the record stating that the existence of bedding planes, if any, would not affect development of the property.

We agree with LUBA's determination except to caution that had the geologic hazard assessment or other source of relevant evidence said nothing about bedding planes, the report would not have supplied information required under the ordinance. The hazard report is "required prior to approval of planned developments, coast resorts" and other projects under LUO 4.070(3). Without the report, or its equivalent, the county would be without a required element of its decision-making criteria. In this case, the geologic hazard assessment did address bedding planes and provided a map showing their general location. Testimony established that the bedding planes did not present a hazard to the development. The county's approval criteria do not require more, and LUBA did not err in sustaining the county's approval of the report.

Affirmed.