Argued and submitted August 24, 2005, affirmed March 22, appellant's petition for reconsideration filed April 5 and relators-respondents' response to intervenor-appellant's petition for reconsideration filed April 10 allowed by opinion June 14, 2006
See 206 Or App 288, _____ P3d _____ (2006)

STATE ex rel Ken BUTLER
and The Port of Bandon,
a municipal corporation,
*Relators-Respondents,*

*v.*

The CITY OF BANDON,
a municipal corporation,
*Respondent,*

*and*

Gary CHANG,
*Intervenor-Appellant.*

03CV0276; A124129

131 P3d 855

Douglas M. DuPriest argued the cause for intervenor-appellant. With him on the opening brief were E. Bradley Litchfield, Zack P. Mittge, and Hutchinson, Cox, Coons, DuPriest, Orr & Sherlock, P.C. On the reply brief was Zachary P. Mittge.

Jerry Lesan argued the cause for relators-respondents Ken Butler and The Port of Bandon. With him on the brief was Lesan & Finneran.

No appearance for respondent The City of Bandon.

Before Armstrong, Presiding Judge, and Brewer, Chief Judge, and Murphy, Judge pro tempore.

BREWER, C. J.

## BREWER, C. J.

■ Intervenor Gary Chang seeks review of a peremptory writ of mandamus that the trial court issued to compel the City of Bandon (the city) to grant a land use permit for the construction of a building on property belonging to the Port of Bandon (the port) that is commonly known as "the High Dock." Relators-respondents the Port of Bandon and Ken Butler petitioned for the writ on the ground that the city had failed to timely act on their permit application as required by ORS 227.178. We are bound by the trial court's factual findings that are supported by the evidence. *See Kirschbaum v. Abraham*, 267 Or 353, 355, 517 P2d 272 (1973); *School District 129J v. Fosdick*, 68 Or App 23, 26-27, 681 P2d 1167 (1984), *rev dismissed*, 299 Or 314 (1985). We review for errors of law the trial court's conclusion that the approval of relators' permit application would not "violate a substantive provision of the local comprehensive plan or land use regulations as those terms are defined in ORS 197.015." ORS 227.179(5). We affirm.

The location of the High Dock and the proposed building over water is at the core of this controversy. A map of the dock area is set out below.

The dock was constructed beginning in 1983. The dock is approximately 230 feet long and 41 feet wide. The west side of the dock rests on a berm and riprap revetment that extends into the Coquille River in a northerly direction from its intersection with First Street. First Street runs parallel to the river. The entire length of the dock along its eastern edge is located directly above the toe of the revetment, which is under water. As a consequence, the easternmost 28 feet of the width of the dock—approximately 65 percent of its total width—stands over water on the estuary side of the mean high higher water (MHHW) line of the river.[1] By contrast, the westernmost 13 feet of the width of the dock is located above land, that is, the revetment. Immediately to the west of the dock is a gravel road that is located along the top of the revetment and extends in a northerly direction. The dock and gravel road are, thus, perpendicular to the shore and First Street. A boardwalk and boat ramp are located to the west of the dock, and a boat basin lies to the east of the dock.

A two-story building currently exists on the south end of the dock. Butler proposes to construct a new building toward the south end of the dock. The building would include a booking office for charter fishing boats and facilities for freezing, packing, storing, and shipping of fish catches from charter fishing trips and some retail uses.

Intervenor intervened before the trial court and objected to the issuance of the writ. He argued that the proposed building could not be constructed over water on the estuary side of the MHHW line without violating Statewide Land Use Planning Goals 16, "Estuarine Resources," and 17, "Coastal Shorelands."

After a trial, the court issued the writ. The court concluded that the Coquille River Estuary Management Plan (CREMP), adopted by Coos County and the city, and the city's comprehensive plan identified the dock as being located in an area in which certain uses that are not especially suited for water-dependent use are permitted. The court further

---

[1] The MHHW line forms the boundary between "a body of water and the land" as defined in the comprehensive plan and the "shoreline" as defined by Statewide Land Use Planning Goals 16 and 17.

concluded that the area of the High Dock, including the portion of the dock standing waterward of the MHHW line, is located within the comprehensive plan's Shoreland Management Unit No. 3 and zoned within its Shoreland Overlay and Marine Commercial C-3 zoning designation. Those designations permit uses not authorized under the more restrictive "Aquatic Management" plan designation; the latter designation permits uses consistent with the water-related uses to which the estuarine preservation provisions of Goal 16 give priority. The court also found that a 1993 city ordinance, Ordinance 1320, amending the comprehensive plan "Shoreland Management" designation for a portion of the High Dock, was acknowledged by the Land Conservation and Development Commission (LCDC) as being in compliance with statewide land use planning goals. The court concluded that intervenor's argument that the proposed building would violate Goals 16 and 17 constituted an impermissible collateral attack on the city's comprehensive plan and implementing ordinances, including Ordinance 1320.

On review, intervenor asserts that the proposed building would violate statewide land use planning goals and, if they are interpreted consistently with those goals, the city's own comprehensive plan and implementing regulations. Intervenor argues that, because the High Dock is built over water, any structure added to it must fit within a relatively limited number and variety of uses permitted in plan and zoning designations that are in compliance with Goals 16 and 17.

■   We first consider whether, by their terms, the comprehensive plan, CREMP, and pertinent city zoning ordinances permit construction of the proposed building. As we now explain, we conclude that the issuance of a permit for the building would not violate a substantive provision of the local comprehensive plan or implementing land use regulations. In 1984, LCDC acknowledged the city's plan and land use regulations for the Coquille River Estuary and areas within the coastal shorelands. The acknowledgment includes a statement that the plan and regulations complied with Goals 16 and 17. The 1984 acknowledgment order and attached Department of Land Conservation and Development (DLCD)

staff report do not specifically refer to the berm or the High Dock.

The comprehensive plan was amended in 1991.[2] According to the amended plan, some areas that are located within the "Marine Commercial" designation are suitable for "especially suited for water-dependent" uses (ESWD). However, appended to the description of the "Marine Commercial" designation is a note stating that certain areas adjacent to the estuary are not suitable for water-dependent or water-related uses and, therefore, may be considered for non-water-dependent or non-water-related uses. The plan also includes Shoreland Management Unit 3, "The Bandon Waterfront." That unit includes both areas that are considered to be suitable for ESWD uses and areas that are not. According to the plan, the ESWD areas in Shoreland Management Unit 3 "begin at the west end of the Bandon Fisheries Building and extend up to the high dock, where there exists a fish buying station and the remainder of the jetty that protects the boat basin." Those areas that are not suited for water-dependent uses include "the remainder of the C-3 properties west of the Bandon Fisheries [B]uilding, the new Port office and the remainder of the high dock facility which, for various reasons, cannot be used for or do not have the essential characteristics of ESWD sites." The port office is located in the building at the south end of the dock.

The 1991 version of the comprehensive plan divided Shoreland Management Unit 3 into subunits, including subunit 3-A, which has a Marine Commercial designation, and subunit 3-E, which has an ESWD designation. The Bandon Zoning Ordinance Map illustrates the text of the plan. According to the map, the High Dock is included in Shoreland Management subunit 3-A, and the berm north of the dock is located in subunit 3-E.[3] Estuarine (or "Aquatic") Management Unit 4-D adjoins the eastern side of the High

---

[2] We find no indication in the record as to whether the 1991 amendments to the comprehensive plan were acknowledged by LCDC. In any case, because intervenor does not assert that the 1991 version of the plan was unacknowledged, we do not further consider that issue.

[3] In 1993, the city amended its zoning ordinance, but the amended ordinance and map preserved those designations.

Dock. According to the plan, that unit is "bordered by the High Dock riprap, the Bandon waterfront and the causeway leading to the old Moore Mill truckshop." Fairly read, the term "high dock rip-rap" refers to the riprap on which the dock is partially constructed. The plan thus limits Estuarine Management Unit 4-D to the eastern edge of the dock.

In August 1993, the city adopted Ordinance 1320 at the request of the port. In its petition, the port explained that the purpose of the ordinance was to redesignate portions of Shoreland Management Unit 3 from subunit 3-E to subunit 3-A. The city adopted findings to justify the redesignation. The findings provide, in part:

> "Currently, most of the Port's Marine Commercial land carries an additional classification of Shoreland Management 3E (Especially Suited for Water Dependent Uses). This ESWD designation covers the Bandon Fisheries property, the parking areas between the fisheries building and the Port office, the boardwalk over the commercial basin jetty, the most northern 85 feet of the High Dock, and the strips of land forming the southern and eastern boundaries of the commercial boat basin. The first 165 feet of High Dock property, the boat ramp and Weber's Pier are not ESWD; nor is the Moore Mill truck shop property (not owned by the port). These areas are designated Shoreland Management Unit 3-A, which permits uses allowed by the underlying C-3 zone."

In particular, Ordinance 1320 changed the designation of the following described area from subunit 3-E to subunit 3-A:

> "Commencing at the Southeast corner of the Port High Dock intersection with First Street, proceeding Northerly along the High Dock and concrete dock to the end of the concrete dock, then Westerly across the access road to the toe of the riprap on the West side of the access road, and then along the toe of the riprap Southerly, Westerly to the boat launching facility then parallel to the boat launching facility in a Westerly direction to the edge of the Port's parking lot and Southerly along the edge of the parking lot to First Street and then generally Easterly along First Street to the point of beginning, which is roughly the Southeast corner of the Port's High Dock Building."

Only one conclusion rationally flows from the foregoing land use regulations: the High Dock has a Marine Commercial zoning designation, not an ESWD designation. Intervenor does not contend that the proposed building would not be permitted in the Marine Commercial zone. Accordingly, if intervenor's arguments on appeal solely pertained to the meaning of those regulations, we would readily conclude that the proposed building is a permitted use.

■ However, as noted, intervenor argues that the proposed use is inconsistent with applicable statewide land use planning goals and that the city's land use regulations must, irrespective of their express terms, be interpreted consistently with those goals. As explained below, the issue whether Ordinance 1320 was properly acknowledged is central to our analysis of that argument.

Intervenor asserts that, for three reasons, Ordinance 1320 was not properly acknowledged. First, he argues that the ordinance was not timely submitted to DLCD under ORS 197.615(1) (1983)[4] within five working days after its adoption but, rather, was submitted to DLCD approximately four years later, in 1997. Second, intervenor argues that the ordinance was ineffective because the city's petition for acknowledgment did not include a statement of the affected statewide land use planning goals. Finally, intervenor argues that the ordinance was ineffective under ORS 197.615(1) (1983) because it did not include supporting findings.

We reject each of those arguments. The record shows that, in March 1993, the city sent DLCD formal written notice that it proposed to adopt Ordinance 1320. The city

---

[4] ORS 197.615(1) (1983) provided:

"A local government that amends an acknowledged comprehensive plan or land use regulation or adopts a new land use regulation shall mail or otherwise submit to the Director of the Department of Land Conservation and Development a copy of the adopted text of the comprehensive plan provision or land use regulation together with the findings adopted by the local government. The text and findings must be mailed or otherwise submitted not later than five working days after the final decision by the governing body. If the proposed amendment or new regulation that the director received under ORS 197.610 has been substantially amended, the local government shall specify the changes that have been made in the notice provided to the director."

The statute remained unchanged between 1983 and 1999. *See* Or Laws 1999, ch 255, § 1.

planning director sent a letter to DLCD stating that the subject of the ordinance was a proposed zoning modification and comprehensive plan amendment to change the designations of shorelands overlay management units on a portion of the Bandon waterfront. The letter included a draft of supporting findings of fact. Also included with the letter was a "notice of proposed action" consisting of "[r]eclassification of portions of the Bandon Waterfront from Shorelands Management Unit 3-E (ESWD) to Shorelands Management Unit 3-A (MC)." There is nothing in the record to suggest that it was not clear to DLCD which statewide land use planning goals might be implicated by the amendment.

The record further shows that, in September 1997, the city provided DLCD with a copy of the adopted text of the ordinance. In its notice to DLCD, the city stated that the adopted ordinance was the same as the ordinance proposed in 1993. Thereafter, DLCD provided notice of the adopted ordinance to persons requesting it. *See* ORS 197.625(3) (1995), *amended by* Or Laws 1999, ch 348, § 9; Or Laws 1999, ch 621, § 5, Or Laws 2005, ch 793, § 3. Under ORS 197.625(1) (1995),[5] an interested person could seek review of the acknowledgment within 21 days of that notice. No appeal was filed from the adoption of Ordinance 1320. Under ORS 197.625(4)(a) (1995), DLCD then issued a "Certificate of Acknowledgment of Plan Amendment" for the plan as amended, including Ordinance 1320. ORS 197.625(4)(a) (1995) authorized the director of DLCD to issue a certificate of acknowledgment if no timely appeal from the adoption of a local plan amendment is filed. In the absence of timely notice of intent

---

[5] ORS 197.625(1) (1995) provided:

"If no notice of intent to appeal is filed within the 21-day period set out in ORS 197.830(8), the amendment to the acknowledged comprehensive plan or land use regulation or the new land use regulation shall be considered acknowledged upon the expiration of the 21-day period. An amendment to an acknowledged comprehensive plan or land use regulation is not acknowledged unless the adopted amendment has been submitted to the director as required by ORS 197.610 to 197.625 and the 21-day appeal period has expired, the board affirms the decision or the appellate courts affirm the decision."

The 1995 version of the statute was, in all pertinent respects, identical to the version in effect in 1993 when the city should have submitted notice of adoption of the ordinance to the director.

to appeal, the ordinance was deemed to have been acknowledged. Accordingly, it is now too late for intervenor to argue that the ordinance was not acknowledged to be in compliance with applicable statewide land use planning goals.

■ Moreover, nothing in ORS 197.615 (1995) or any other related statute suggests that every procedural deviation from its requirements is fatal to the validity of an acknowledgement. To the contrary, for acknowledgement to occur, ORS 197.625(1) (1995) merely requires that "the notices required under ORS 197.610 and [ORS] 197.615 have been submitted to the Director of [DLCD]," not that the notices have been *timely* submitted. *Cf. ODOT v. City of Oregon City*, 153 Or App 705, 708, 959 P2d 615 (1998) (holding that "there is *always a* mailing requirement under ORS 197.615, from which the time for appealing post-acknowledgment plan and regulation amendments is to be measured under ORS 197.830(8)" (emphasis in original)); *Oregon City Leasing, Inc. v. Columbia County*, 121 Or App 173, 177, 854 P2d 495 (1993) (failure to provide notice of adoption to DLCD is not merely a procedural error, because such an omission precludes the department's review for assurance that plan amendments comply with the statewide planning goals). Because intervenor has not shown that he suffered any prejudice from the city's failure to timely send an adoption notice to DLCD as required by ORS 197.615(1) (1995), we reject his argument that the 1997 acknowledgement of Ordinance 1320 was ineffective. Accordingly, the trial court did not err in relying on the ordinance as having been acknowledged in reaching its decision.

■ Intervenor nonetheless insists that there is more to this case than the interpretation and acknowledgement of local land use regulations. As noted, intervenor's primary thesis is that Goals 16 and 17 prohibit the construction of the building on the High Dock because it is located over a protected estuary. In essence, intervenor contends that any use of a structure located above an estuary is subject to the same restrictions as if the use were in the estuary. In intervenor's view, the city's comprehensive plan and implementing regulations must be interpreted consistently with the statewide goals. According to intervenor, the city may not convert an estuary to shoreland without taking an exception to Goal 16.

Because the city took no such exception, intervenor argues that it could not convert the estuary or portions of the High Dock above it to a shoreland designation. At the heart of intervenor's argument is the premise that the MHHW line establishes a fixed boundary between estuary and shore, and Goal 16 prohibits shoreland uses on the waterward side of the MHHW line.

There are two difficulties with intervenor's premise. First, his understanding of the uses that Goal 16 allows is too restrictive. Under Goal 16, the highest priority for use of an estuarine resource is one that maintains the integrity of the estuarine ecosystem.[6] The lowest priority is a use that is not dependent on or related to estuarine resources but that nonetheless does not alter, reduce, or damage such resources. Goal 16 does not prohibit non-water-related uses in areas identified as estuarine resource areas. Rather, the goal establishes priorities of use and places non-water-dependent uses at the lowest of four priorities of use. The goal permits "[n]ondependent, nonrelated uses which do not alter, reduce or degrade estuarine resources and values." *See* OAR 660-015-0010(1). A similar hierarchy of uses exists under Goal 17, with priority given to water-dependent uses over non-water-dependent uses. In addition, though, Goal 17 authorizes local governments to plan for a larger universe of uses that are not directly related to estuaries and coastal waters.

■ Second, because, as discussed, the 1997 acknowledgement of Ordinance 1320 was effective, intervenor's argument runs afoul of ORS 197.175(2)(c) and (d). ORS

---

[6] Goal 16 exists

"[t]o recognize and protect the unique environmental, economic, and social values of each estuary and associated wetlands; and

"To protect, maintain, where appropriate develop, and where appropriate restore the long-term environmental, economic, and social values, diversity and benefits of Oregon's estuaries."

(Boldface in original.)

"Estuary" is defined in OAR 660-017-0005(6) as

"a body of water semi-enclosed by land, connected with the open ocean, and within which salt water is usually diluted by freshwater derived from land. The estuary includes estuarine water, tidelands, tidal marshes, and submerged lands. Estuaries extend upstream to the head of tidewater, except for the Columbia River estuary, which, by definition, is considered to extend to the western edge of Puget Island."

197.175(2)(c) and (d) provide, respectively, that if a local government's "comprehensive plan and land use regulations *have not been acknowledged* by the commission," then it must "make land use decisions and limited land use decisions in compliance with the goals[,]" and if its "comprehensive plan and land use regulations *have been acknowledged* by the commission," then it must "make land use decisions and limited land use decisions in compliance with the acknowledged plan and land use regulations * * *[.]" (Emphasis added.) Because the city's plan, the CREMP, and implementing ordinances, including Ordinance 1320, have been acknowledged, the pertinent permit approval criteria inhere in those documents and in any state laws or regulations that apply irrespective of an acknowledgment.

Decisions interpreting ORS 197.829 inform our conclusion. That statute provides:

"(1) [LUBA] shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements.

"(2) If a local government fails to interpret a provision of its comprehensive plan or land use regulations, or if such interpretation is inadequate for review, the board may make its own determination of whether the local government decision is correct."

ORS 197.829 is not directly applicable to this case because, in a mandamus action, the trial court, not a local government, is charged with interpreting pertinent land use regulations.

However, in construing that statute, we have rejected arguments that are substantially similar to the one that intervenor makes in this case.

■      As we explained in *Opus Development Corp. v. City of Eugene*, 141 Or App 249, 255-56, 918 P2d 116 (1996), our decision in *Friends of Neabeack Hill v. City of Philomath*, 139 Or App 39, 911 P2d 350, *rev den*, 323 Or 136 (1996) stands for the principle that,

> "in the review of a local land use decision to which an acknowledged comprehensive plan or regulatory provision is applicable, ORS 197.829(1)(d) does not enable LUBA *or us* to consider a *goal* consistency challenge to a local interpretation of the provision if: (1) the local government's interpretation is a correct statement of the meaning of the provision; (2) the challenge depends in substance on a showing that the acknowledged provision itself, as distinct from the interpretation of it, is contrary to a goal; and (3) a direct assertion that the acknowledged provision is inconsistent with the goal would not be cognizable under ORS 197.835."

*Opus Development Corp.*, 141 Or App at 255-56 (first emphasis added; second emphasis in original).

In *Friends of Neabeack Hill*, we held that ORS 197.829, which was enacted in 1993, did not override other statutes, such as ORS 197.175(2)(c) and (d), which provide that, after plan acknowledgment, local land use decisions need comply only with acknowledged local regulations. 139 Or App at 46-49. After reviewing the text and context of ORS 197.829 and its legislative history, we resorted to the maxim that courts "are required to harmonize apparent conflicts within a statute if it is possible to do so." *Id.* at 49 (internal quotation marks omitted). We concluded:

> "Applying that principle here, we conclude that a goal or rule compliance challenge cannot be advanced under ORS 197.829(1)(d) when, however phrased, the argument necessarily depends on the thesis that the acknowledged local land use legislation itself does not comply with a goal or rule, and when a direct contention that the acknowledged legislation is contrary to the goal or rule could not be entertained under ORS 197.835. Situations undoubtedly will arise where that rule will prove difficult to apply. The line

between an interpretation and the provision it interprets will not always be sharp."

*Id.*

This case presents no such difficult situation. The controlling regulations are found within the city's acknowledged comprehensive plan and implementing ordinances, including Ordinance 1320, and the trial court did not err in concluding that the proposed structure is a permitted use under those documents. Because intervenor's challenge depends on the premise that the acknowledged plan and implementing ordinances are inconsistent with Goals 16 and 17, by force of ORS 197.175(2)(c) and (d), we cannot entertain it.[7]

Affirmed.

---

[7] Even if that were not so, intervenor's argument is unpersuasive. Although it is true that the statewide goals define "shoreline" with reference to the MHHW line, that definition is of no consequence unless it is coupled with a substantive use requirement or prohibition. Intervenor does not refer us to any source of law that prohibits the proposed use because of the location of the dock with relation to the MHHW line. Indeed, as noted, Goal 16 does not prohibit uses that are not water-dependent. Instead, it classifies estuaries as "Natural" and "Development." The CREMP, in turn, classifies the Coquille River Estuary as a "Shallow Draft Development Estuary." With respect to "development" estuaries, Goal 16 provides:

"Where consistent with the purposes of this management unit and adjacent shorelands designated especially suited for water-dependent uses or designated for waterfront redevelopment, water-related and nondependent, nonrelated uses not requiring dredge or fill; mining and mineral extraction; and activities identified in (1) and (2) above shall also be appropriate."