Argued and submitted December 7, 2021, affirmed February 24, 2022

James J. NICITA,
Northwest Environmental Defense Center,
and Patricia Spady,
*Petitioners,*

*v.*

CITY OF OREGON CITY,
*Respondent.*

Land Use Board of Appeals
2020037, 2020039; A177095

507 P3d 804

This case is on review from a Land Use Board of Appeals (LUBA) order that affirmed the city's adoption of two ordinances—Ordinance 19-1014, which adopted a stormwater master plan (SMP), and Ordinance 19-1015, which updated the city's stormwater and grading design standards (design standards). Petitioner Northwest Environmental Defense Center (NEDC) argues that LUBA erred because the ordinances violate Statewide Planning Goal 6, and petitioners Spady and Nicita argue that LUBA erred because those ordinances violate Statewide Planning Goal 2. *Held*: (1) LUBA did not err in concluding that Goal 6 was not implicated by the SMP or design standards in the manner asserted by NEDC; (2) LUBA did not err in concluding that the SMP did not violate Goal 2, Part I, or Goal 2, Part III, in the manner asserted by Spady; and (3) LUBA did not err in concluding that the city did not take a Goal 2 exception to Goal 6 in the design standards, as asserted by Nicita.

Affirmed.

Karl G. Anuta argued the cause and filed the briefs for petitioners James J. Nicita and Patricia Spady.

Jesse A. Buss argued the cause for petitioner Northwest Environmental Defense Center. Also on the brief were Willamette Law Group; Jonah Sandford and Northwest Environmental Defense Center; and Michael T. Burleson and Morris & Sullivan PC.

Carrie A. Richter argued the cause for respondent. Also on the briefs were William K. Kabeiseman and Bateman Seidel Miner Blomgren Chellis & Gram, P.C.

Laura Maffei and Cable Huston, LLP, filed the brief *amicus curiae* for Oregon Association Clean Water Agencies.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

ORTEGA, P. J.

Petitioners Northwest Environmental Defense Center (NEDC), Patricia Spady, and James Nicita each seek review of a Land Use Board of Appeals (LUBA) order that affirmed the city's adoption of two ordinances—Ordinance 19-1014, which adopted a stormwater master plan (SMP), and Ordinance 19-1015, which updated the city's stormwater and grading design standards (design standards). We review LUBA's order to determine if it is "unlawful in substance," ORS 197.850(9)(a), and conclude that it is not. Accordingly, we affirm.

The city adopted the SMP and the design standards to meet requirements set forth in the city's National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System (MS4) discharge permit. The Oregon Department of Environmental Quality (DEQ) issued the MS4 permit to the city to implement applicable federal and state laws governing the discharge of pollutants into water bodies. The city adopted the SMP as an amendment to the city's comprehensive plan, replacing a 1988 drainage master plan, and it will "guide stormwater-related priorities and capital improvement projects (CIPs) over the next 10 to 15 years." The design standards replace standards adopted by the city in 2015 and "regulate the development and operation of all publicly and privately-owned stormwater improvements within the City."

We take the following background facts as stated in LUBA's order:

"The MS4 permit program is administered by DEQ to ensure municipal compliance with the federal Clean Water Act (CWA). DEQ has also promulgated state water quality policies and standards, including the antidegradation policy at OAR 340-041-0004(1):

"'The purpose of the Antidegradation Policy is to guide decisions that affect water quality to prevent unnecessary further degradation from new or increased point and nonpoint sources of pollution, and to protect, maintain, and enhance existing surface water quality to ensure the full protection of all existing beneficial uses.'

"Much of Oregon City was developed before stormwater standards were adopted. The SMP explains:

"'Areas of the city that have been developed in the last 20 years generally have included the implementation of water quality treatment facilities. This includes roughly the southern third of the city. The areas developed during the 1950s through the 1990s are less likely to include water quality treatment, as the City's design standards requiring treatment were adopted in 1999. The oldest portion of the city that was developed prior to 1950 does not include water quality treatment facilities. These untreated areas include most of the industrial and commercial areas north of downtown, in the vicinity of Abernethy Creek and the Clackamas River. Over time some of the areas not originally serviced with water quality facilities may have been retrofit with public facilities to meet regulatory guidelines, when public projects or private redevelopment projects were constructed, but those areas are small compared to the total drainage area.'

"The city has no centralized stormwater treatment facility. The city is growing, which requires expansion of the city's stormwater system. The city explains that the SMP is based, in part, on information in a 2015 water quality assessment, which evaluated the level of water quality treatment that the city should aim to achieve for pollutants that have been assigned a total maximum daily load (TMDL) based on receiving water bodies exceeding water quality criteria for that pollutant. Three bacterial TMDLs apply to the city discharges.

"The SMP explains that an increase in city water quality treatment that would be required to achieve TMDL target wasteload allocations for bacteria 'may not be attainable.' The city's MS4 permit requires the city to increase water quality treatment across the city, thereby improving water quality for a wide range of pollutants. Increased water quality treatment will occur through various mechanisms including future development and redevelopment.

"The city's MS4 permit requires the city to reduce the discharge of water pollutants to the [maximum extent practicable (MEP)]. To that end, the city is required to adopt a stormwater management plan, which, in turn, calls for [a stormwater master plan]. The challenged SMP

replaces the city's 1988 Drainage Master Plan and plans for stormwater-related capital improvements, including new storm drains. The SMP addresses aging infrastructure through surveying and inventorying the capacity and condition of the existing conveyance system to identify rehabilitation and replacement opportunities where appropriate. In addition, the SMP sets out a number of [best management practices (BMPs)] to reduce pollutants in stormwater discharges to the MEP, including design requirements for new development and redevelopment.

"Also to implement the MS4 permit requirement that the city reduce the discharge of water pollutants to the MEP, the city developed the design standards, which provide requirements for site assessment and planning, stormwater source controls, erosion and settlement controls, conveyance system design, and stormwater management facility design. The challenged design standards replace a set of design standards that the city adopted in 2015."

(Record citations and footnotes omitted.)

In addition, as relevant here, the SMP provides, with respect to statewide planning goals:

"When it comes to water quality, the City complies with the Statewide Land Use Goals by adopting comprehensive plan policies that call for protection of riparian resources through development restrictions, prioritized capital expenditures for infrastructure, and design standards regulating how stormwater is treated before it enters the municipal system. Comp Plan Policy 11.4.7[—]*Provide stormwater management services and monitor, report and evaluate success of the services consistent with the NPDES MS4 permit requirements*[—]provides clear direction to the City to utilize the NPDES MS4 permitting process for stormwater planning. Moreover, through this policy, the Comprehensive Plan recognizes that the City operates under an NPDES MS4 Permit issued by the Oregon DEQ.

"The NPDES MS4 Permit is the means by which the State implements the Federal NPDES program required by the Clean Water Act. Oregon City's approach to conduct stormwater management planning according to the NPDES MS4 permit complies with both State water quality rules and Statewide Planning Goals. The City's Stormwater and Grading Design Standards implement the NPDES

MS4 Permit requirements for new and re-development and provide additional clarity for developers.

"Stormwater management is a critical component of the City's obligation to implement Statewide Planning Goals 5, 6 and 11. Statewide Planning Goals 5 and 6 call for the protection of certain resources, such as rivers and wetlands, as well as air and water quality. Statewide Planning Goal 11 calls for the provision of utilities. These goals are accomplished through the implementation of a Comprehensive Plan that explains the City's policies to achieve these objectives."

(Italics in original.)

Petitioners appealed the city's adoption of the SMP and the design standards to LUBA. NEDC argued that the SMP and the design standards violated statewide planning Goal 6, while Spady and Nicita argued that they violated various provisions of statewide planning Goal 2. LUBA rejected each of the petitioner's challenges. We address LUBA's order in our analysis of each petitioner's challenge on judicial review.

We start with NEDC's assignments of error, which assert that the SMP and the design standards violate Goal 6. Goal 6 is "[t]o maintain and improve the quality of the air, water and land resources of the state," and further provides, in part:

"All waste and process discharges from future development, when combined with such discharges from existing developments shall not threaten to violate, or violate applicable state or federal environmental quality statutes, rules and standards. With respect to the air, water and land resources of the applicable air sheds and river basins described or included in state environmental quality statutes, rules, standards and implementation plans, such discharges shall not (1) exceed the carrying capacity of such resources, considering long range needs; (2) degrade such resources; or (3) threaten the availability of such resources."

OAR 660-015-0000(6).

NEDC argued to LUBA that the city cannot establish compliance with Oregon's standards for toxic pollutants in water bodies because levels in the Willamette River

already exceed state standards and, because the SMP does not even address that issue, it is in violation of Goal 6. Similarly, NEDC argued that the design standards would allow future discharges without a sufficient requirement that those discharges will comply with the toxics standards, in violation of Goal 6.[1]

LUBA rejected NEDC's arguments, explaining that "Goal 6 comes into play when a decision authorizes future development that alone or combined with existing development will violate or threaten to violate state or federal environmental standards." LUBA further explained that

"Goal 6 does not provide a legal standard that is independent of what the state and federal water quality programs require—programs that DEQ administers. Instead, Goal 6 works in concert with those standards to ensure that land use planning and regulations prohibit discharges from development that 'threaten to violate, or violate applicable state or federal environmental quality statutes, rules and standards.'"

Because the SMP and the design standards "do not authorize any new development or increase[] intensity of development," but rather, "regulate the stormwater impacts of development within the city," LUBA concluded that "Goal 6 is not implicated by the challenged decisions." Further, LUBA concluded that "Goal 6 provides no basis for reversal or remand to remedy existing violations of environmental standards." LUBA also concluded that the design standards implement BMPs to reduce pollutants in stormwater discharges and, "[b]ecause the use of BMPs as set forth in the city's MS4 permit is sufficient to satisfy water quality standards with respect to DEQ, it is sufficient to satisfy the city's obligations with respect to Goal 6." That is, LUBA stated,

---

[1] NEDC also asserted to LUBA, and repeats to us on judicial review, that the standard for Goal 6 should be to "completely prevent" and "eliminate" the possibility that future development will "threaten to violate, or violate applicable state or federal environmental quality statutes, rules and standards." NEDC takes that standard from a pair of Land Conservation and Development Commission (LCDC) cases from 1978 and 1980, addressing a particular development. *Klamath Irrigation District v. Klamath County Planning Commission*, 3 LCDC 327 (1980); *Klamath Irrigation District v. Klamath County Board of Commissioners*, 2 LCDC 167 (1978). In response to NEDC's argument, LUBA adhered to its own long-established standards for Goal 6 compliance review. We do not reach the issue.

"[t]he design standards protect water quality from pollution discharges from new development and redevelopment, and provide a reasonable expectation that the applicable state and federal standards will be met when development occurs."

We review LUBA's order to determine whether it is "unlawful in substance." ORS 197.850(9)(a). A LUBA order is unlawful in substance "if it represented a mistaken interpretation of the applicable law." *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001). The SMP is an amendment to the city's acknowledged comprehensive plan, which "may be reviewed for compliance with a land use goal if the amendment implicates that land use goal." *Central Oregon Landwatch v. Deschutes County*, 301 Or App 701, 705, 457 P3d 369, *rev den*, 366 Or 492 (2020) (citing *Opus Development Corp. v. City of Eugene*, 141 Or App 249, 254, 918 P2d 116 (1996)). "[A] statewide goal is only implicated for review purposes if the [plan amendment] itself affects the goal, either directly or indirectly." *Id.* (citing *Urquhart v. Lane Council of Governments*, 80 Or App 176, 181-82, 721 P2d 870 (1986)). That is, a plan amendment is not reviewable for potential goal noncompliance that is not a direct or indirect consequence of the amendment itself. *Id.* at 705-06 (discussing *Urquhart*).

That concept is illustrated by *Central Oregon Landwatch*. In that case, the county adopted a comprehensive plan amendment to change plan designation for a parcel of property from surface mining to rural residential exception area and its zoning from surface mining to multiple use agricultural. 301 Or App at 706-07. Petitioner argued that the county's decision violated Goal 3, because the property qualified as agricultural land and had to be included in the Goal 3 inventory, or else the county needed to apply a Goal 3 exception to the property. LUBA concluded that the plan amendment did not affect the county's compliance with Goal 3, because the property had never been included in the Goal 3 inventory of the county's acknowledged plan. *Id.* at 709. That is, nothing in the plan amendment itself affected the county's Goal 3 compliance—it remained the same both before and after the amendment. We concluded that LUBA's order was not unlawful in substance, because LUBA correctly applied the legal principle for reviewing

plan amendments for compliance with statewide planning goals. *Id.* at 712.

On judicial review, NEDC argues that LUBA is mistaken in its construction of Goal 6 in several respects. However, we need only address LUBA's first conclusion— that Goal 6 is not implicated by the SMP and the design standards.[2] NEDC argues that LUBA erred in concluding that Goal 6 was not implicated here, arguing that "a specific development authorization, a new use, or increased development density is not required to trigger Goal 6 review." (Emphasis omitted.) Rather, NEDC asserts, Goal 6 review is required in any comprehensive plan or plan amendment that "implicates" Goal 6, which NEDC argues applies here, because the SMP and the design standards are a key part of the city's Goal 6 compliance program.

We disagree. Goal 6 provides that "[a]ll waste and process discharges from future development, when combined with such discharges from existing developments shall not threaten to violate, or violate applicable state or federal environmental quality statutes, rules and standards." Goal 6, by its own terms, applies to "future development." As recognized by LUBA, the SMP and the design standards do not include planning for any new future development that directly or indirectly implicates the city's ability to comply with Goal 6. The city's compliance with Goal 6 was contained in other planning the city has already done that set the planned future development in the city. To the extent the city is not compliant with Goal 6 with respect to toxics standards, that noncompliance is not a consequence of the SMP or the design standards. With respect to what is in the SMP and the design standards, NEDC fails to explain how recommending capital improvement projects in the SMP to improve water quality or creating design standards to control stormwater runoff from development and redevelopment as required by the city's MS4 permit results in city noncompliance with Goal 6. Goal 6 compliance, in the manner asserted by NEDC, was not implicated by the SMP

---

[2] We assume for purposes of our review, as did LUBA, that LUBA's scope of review included reviewing the design standards for compliance with statewide planning goals, ORS 197.835(7)(b), rather than for compliance with the city's comprehensive plan, ORS 197.835(7)(a).

or the design standards. As a result, LUBA's order is not unlawful in substance with respect to NEDC's assignments of error.

We next turn to petitioner Spady's assignments of error, asserting that the SMP violates Goal 2, Part I, and Goal 2, Part III. We address each of those parts in turn.

Goal 2 is "[t]o establish a land use planning process and policy framework as a basis for all decisions and actions related to use of land and to assure an adequate factual base for such decisions and actions." OAR 660-015-0000(2). Goal 2, Part I, provides, in part:

> "All land use plans shall include identification of issues and problems, inventories and other factual information for each applicable statewide planning goal, evaluation of alternative courses of action and ultimate policy choices, taking into consideration social, economic, energy and environmental needs. The required information shall be contained in the plan document or in supporting documents."

*Id.*

With respect to Goal 2, Part I, and as relevant on review, Spady argued to LUBA that the city violated Goal 2 by failing to include in the SMP a Goal 6 inventory of water quality of receiving water bodies or, with respect to Goal 6, an evaluation of alternative courses of action and ultimate policy choices considering social, economic, energy, and environmental needs. LUBA rejected Spady's arguments, explaining that Goal 2 "does not impose obligations independent of other applicable statewide planning goals or criteria" and that Spady did not establish that Goal 6, or any other source of law, required an inventory of water quality in the city. With respect to alternative courses of action, LUBA concluded that Goal 6

> "prohibits plan amendments allowing future development that alone or combined with existing development will violate or threaten to violate state or federal environmental standards, including those for water quality. Goal 6 does not permit the city to evaluate whether to allow water quality violations ***. *** Goal 6 also does not require the city

to make findings on alternative means of preventing pollution discharges."

And with respect to ultimate policy choices, LUBA concluded that "Goal 6 does not require the city to express ultimate policy choices with respect to water quality. Those policy choices are made at the federal and state levels," as expressed in Goal 6, Guideline B(3).

On judicial review, Spady asserts that LUBA incorrectly concluded that Goal 2 requirements do not apply unless they are contained in other statewide planning goals; she asserts that the Goal 2, Part I, mention of inventories, alternative courses of action, and ultimate policy choices are independent substantive requirements for each applicable goal, including Goal 6. Spady also reiterates her argument that the city failed to comply with Goal 2 by failing to include in the SMP an inventory of water quality and an evaluation of alternative courses of action and ultimate policy choices, with respect to Goal 6. As we understand Spady's argument, she is not arguing that the city violated Goal 6 itself, as NEDC asserted above; rather, Spady argues that the city violated Goal 2 by failing to adequately explain how the SMP will meet Goal 6, as required by Goal 2.

Spady's argument requires us to construe Goal 2. In construing the goal, "[o]ur objective is to determine the intent of [the Land Conservation and Development Commission (LCDC)], the body that promulgated the rule. In making that determination, we use the same methodology used to interpret a statute, starting with an examination of the text of the rule in context." *Friends of Yamhill County v. City of Newberg*, 240 Or App 738, 743, 247 P3d 767, *rev den*, 350 Or 573 (2011) (citations omitted). Based on that examination, we conclude, similar to LUBA, that what constitutes sufficient information in a plan for purposes of Goal 2, must be informed by the substance of the applicable statewide planning goal at issue.

In looking at the specifics of Goal 2, Part I, we must keep in mind the context of the overarching purpose of Goal 2: "To establish a land use planning process and policy framework as a basis for all decisions and actions related to use of land and to assure an adequate factual base for such

decisions and actions." OAR 660-015-0000(2). Goal 2 has two main functions: to establish a process and policy framework for decisions and to assure an adequate factual base for those decisions. "[A]n 'adequate factual base' is synonymous with the requirement that a decision be supported by substantial evidence." *1000 Friends of Oregon v. LCDC*, 244 Or App 239, 268 n 11, 259 P3d 1021 (2011). In elaborating on those objectives, Goal 2, Part I, provides in part that "[a]ll land use plans shall include identification of issues and problems, inventories and other factual information for each applicable statewide planning goal, evaluation of alternative courses of action and ultimate policy choices, taking into consideration social, economic, energy and environmental needs." That sentence directly relates to the objective of having an "adequate factual base" for decisions.

Focusing on Spady's more specific arguments, we begin with her argument that the city was required by Goal 2, Part I, to develop a water quality inventory for Goal 6. The applicable phrase in Goal 2, Part I, provides that the plan shall include issue identification, inventories, and other factual information for applicable statewide planning goals; that is, the plain text of Goal 2 provides that the plan shall include information needed to address the applicable goal. *See also* OAR 660-015-0000(2) (Goal 2, Part III, Guidelines C(1): "Inventories and other forms of data are needed as the basis for the policies and other decisions set forth in the plan. This factual base should include data on the following *as they relate to the goals* and other provisions of the plan: ***." (Emphasis added.)). Goal 2's mention of "inventories" has no meaning without the context of the phrase "each applicable statewide goal" or without the context of the purpose of those inventories, which is to provide an adequate factual base for decisions. Goal 2 does not require that any inventory that a challenger can come up with must be created and included in a plan; it requires that inventories required by an applicable goal must be included in the plan and that an adequate factual base must be included in the plan. Any other reading divorces the purpose of Goal 2 from the word "inventories" and provides no guidance for planning authorities. Spady does not argue that the SMP lacks an adequate factual base; rather, Spady argues only that it

lacks a specific inventory for water quality. The difficulty with Spady's argument is that Goal 6 and its guidelines do not require a water quality inventory and Spady points to no other source of law that does. Thus, LUBA's order rejecting Spady's inventory argument was not unlawful in substance.

For similar reasons, we also reject Spady's construction of Goal 2, Part I, with respect to "evaluation of alternative courses of action" as it applies to Goal 6 in this case. Again, that phrase needs to be understood in the context of Goal 2's requirement that a plan contain an adequate factual base—and, as relates to Spady's argument here, a factual base that Goal 6 will be met. As LUBA recognized, Goal 6 does not allow for alternative courses of action; it expresses a prohibition that must be heeded: "All waste and process discharges from future development, when combined with such discharges from existing developments shall not threaten to violate, or violate applicable state or federal environmental quality statutes, rules and standards." Spady offers no argument explaining her position beyond a bare assertion that LUBA erred in its construction of Goal 2. We reject that bare assertion. LUBA's order in this respect was not unlawful in substance.

We turn to Spady's argument regarding "ultimate policy choices" as that phrase appears in Goal 2, Part I. Spady's arguments are, at best, muddled, but focus on her assertion that a statement of water quality policy choices is missing in the SMP. However, the SMP does contain an expression of its ultimate water quality policies, as set out above, 317 Or App at 712-14, which reference and rely on compliance with the city's MS4 permit. Spady fails to acknowledge that statement or provide any argument as to why it is inadequate. LUBA did not reference that policy statement, instead stating that Goal 6 places ultimate policy choices at the state and federal level, because those are the identified standards in Goal 6 that must be met. LUBA's explanation matches the ultimate policy choice the city expressed in its 2004 comprehensive plan and reiterated in the SMP, and, thus, LUBA's order is not unlawful in substance.

We turn to Spady's Goal 2, Part III, argument. Goal 2, Part III, provides that "[g]overnmental units shall review

the guidelines set forth for the goals and either utilize the guidelines or develop alternative means that will achieve the goals. All land-use plans shall state how the guidelines or alternative means utilized achieve the goals." OAR 660-015-0000(2). To LUBA, Spady argued that the city failed to make findings that comply with Goal 2, Part III by not including the text of Goal 6 in the SMP or providing the "alternative means" of achieving Goal 6. LUBA rejected that argument:

> "Goal 2 does not 'exist in a vacuum' and does not impose obligations independent of other applicable statewide planning goals or criteria. *OCAPA v. City of Mosier*, 44 Or LUBA 452, 462 (2003). The Goal 6 guidelines state that 'methods and devices for implementing' Goal 6 include 'land use controls and ordinances.' Goal 6, Guideline B(1)(2). The SMP acknowledges the existence and binding nature of the design standards and the design standards refer to the relevant [Oregon City Municipal Code] chapters. Spady does not dispute that future development will have to comply with those provisions."

On judicial review, Spady asserts that LUBA erred because, in her view, Goal 2, Part III, requires the city to include in the text of the SMP the text of Goal 6 or a more detailed description of the alternative means utilized to achieve Goal 6, such as DEQ standards. Spady argues that LUBA's conclusion was erroneous because the Goal 2 guidelines for planning requires the text to be included in the SMP and that the SMP's references to the design standards and the design standards reference to municipal code provisions were not "included" in the SMP. *See* OAR 660-015-0000(2) (Goal 2, Part III, Guidelines C(2): "The following elements should be included in the plan: (a) Applicable statewide planning goals[.]"). Spady also argues that LUBA erred in relying on Goal 6, Guideline B(1) and (2) in its order, because that guideline applies to implementing measures and not planning documents. Finally, Spady asserts that this assignment of error is important because the 2004 comprehensive plan, which the SMP amends, also failed to include the text of Goal 6 and the SMP "finally presents the opportunity, effectively, to 'cure' the defect in the 2004 Plan."

Again, we start with text of the provision at issue. Goal 2, Part III, in the section titled "use of guidelines," provides:

"Governmental units shall review the guidelines set forth for the goals and either utilize the guidelines or develop alternative means that will achieve the goals. All land-use plans shall state how the guidelines or alternative means utilized achieve the goals.

"**Guidelines**—are suggested directions that would aid local governments in activating the mandated goals. They are intended to be instructive, directional and positive, not limiting local government to a single course of action when some other course would achieve the same result."

OAR 660-015-0000(2) (boldface in original). In Goal 2, Part III, in the section titled "plan content," the guidelines provide that "[t]he following elements should be included in the plan: (a) Applicable statewide planning goals[.]" *Id*.

As a starting point, nothing in the text of Goal 2, Part III, or the guideline for plan content *requires* that the full text of a goal be restated in a plan or amended plan. Rather, the governmental unit is directed to state how it used the guidelines to achieve the goal or alternative means to achieve the goal. LUBA concluded that the city did that by referencing the mandatory design standards, which in turn also reference applicable municipal code provisions. We also note that the SMP did include an explanation of the means for achieving Goal 6, which includes complying with its MS4 permit, "adopting comprehensive plan policies that call for protection of riparian resources through development restrictions, prioritized capital expenditures for infrastructure, and design standards regulating how stormwater is treated before it enters the municipal system," adopting the design standards that "implement the NPDES MS4 Permit requirements for new and re-development and provide additional clarity for developers," and "implement[ing] a Comprehensive Plan that explains the City's policies to achieve these objectives." Spady, however, does not explain why the city's statements of how it intends to achieve Goal 6 fail to comply with Goal 2, Part III's directive that plans "state how the guidelines or alternative means utilized

achieve the goals." Instead, Spady asserts that such state-
ment is missing from the SMP. It is not missing. LUBA's
order is not unlawful in substance with regard to Spady's
Goal 2, Part III, argument.

Finally, we turn to Nicita's assignments of error,
which also are based on Goal 2. As relevant on judicial
review, Nicita argued to LUBA that the city took an "illegal"
Goal 2 exception to the requirements of Goal 6, under Goal 2,
Part II, ORS 197.732(1)(b), and OAR 660-004-0005(1), in the
design standards, in Oregon City Municipal Code (OCMC)
13.12.050(B)(1) and (2), and in the city's 2004 comprehensive
plan.

Goal 2, Part II, lists the circumstances when "[a]
local government may adopt an exception to a goal[.]" OAR
660-015-0000(2). It also defines "exception" to mean

"a comprehensive plan provision, including an amendment
to an acknowledged comprehensive plan, that[:]

"(a)   Is applicable to specific properties or situations
and does not establish a planning or zoning policy of gen-
eral applicability;

"(b)   Does not comply with some or all goal require-
ments applicable to the subject properties or situations;
and

"(c)   Complies with standards for an exception."

*Id.*; *see also* ORS 197.732 (codifying goal exceptions); OAR
660-004-0005(1) (for purposes of the definition of "exception"
providing that the standards that must be complied with
are "ORS 197.732(2), the provisions of this division and, if
applicable, the provisions of OAR 660-011-0060, 660-012-
0070, 660-014-0030 or 660-014-0040").

With respect to the 2004 comprehensive plan,
LUBA rejected Nicita's argument, because "the time for
challenging the 2004 [comprehensive plan] passed years ago
and [Nicita's] argument is beyond the scope of this appeal."
LUBA did not specifically address Nicita's challenge to
OCMC 13.12.050, a city provision adopted by an earlier ordi-
nance that he did not challenge. With respect to the design
standards, Nicita argued that it contains an exception to

Goal 6, because the standards apply only to development exceeding 5,000 square feet of new impermeable surface or exceeding 500 square feet of new impermeable surface within a natural resources overlay district.

With respect to that argument, LUBA concluded:

"OAR chapter 660, division 4, interprets the Goal 2 exception process. [OAR] 660-004-0000(2) provides: 'An exception is a decision to exclude certain land from the requirements of one or more applicable statewide goals in accordance with the process specified in Goal 2, Part II, Exceptions.' The problem with petitioner's argument, as the city points out, is that, in adopting the design standards, the city did not decide to exclude land from the requirements of Goal 6. Rather, the city concluded that the design standards comply with Goal 6, notwithstanding the 5,000-square-foot threshold. To the extent that petitioner means to argue that the 5,000-square-foot threshold in the design standards violates Goal 6, petitioner has not developed that argument for our review, and we will not develop it for them."

(Record citation omitted.)

On judicial review, Nicita reprises his arguments, asserting that the city took an illegal Goal 2 exception to the requirements of Goal 6. With regard to the design standards, Nicita argues that the thresholds are an improper exception to Goal 6, because any development under those thresholds would produce storm water runoff that qualifies as a discharge under Goal 6 but excepts those specific properties from ensuring that the discharge does not violate water quality standards. Nicita also argues that the same illegal exception exists in OCMC 13.12.050(B)(1) and (2). Finally, Nicita challenges the city's 2004 comprehensive plan as containing an illegal Goal 2 exception because the plan failed to include a Goal 6 implementing policy.

We summarily reject Nicita's challenge to OCMC 13.12.050 and to the 2004 comprehensive plan, because Nicita did not appeal those decisions to LUBA, having only added mention of them in his briefing in the appeals of different ordinances. With respect to the design standards, we conclude that LUBA did not err in concluding that the

thresholds in the design standards did not take an exception to Goal 6. To take a Goal 2 exception to a statewide planning goal, the city must go through an exception process—the definition of "exception" requires compliance with the exception standards. The city did not purport to go through that process or take an exception from Goal 6 in its adoption of the design standards. To the extent that Nicita means to assert that the design standards thresholds do not comply with Goal 6, Nicita did not make that claim, either to LUBA or to us on judicial review.

Accordingly, we conclude that LUBA's order is not "unlawful in substance."

Affirmed.